**Esequel BANDA, Appellant,**

v.

**The STATE of Texas, Appellee.**

No. 69827.

Court of Criminal Appeals of Texas, En Banc.

Dec. 14, 1994.

44

**48**

Coyt Randal Johnston, Dallas, for appellant.

Andy J. McMullen, Dist. Atty., Hamilton, Robert Huttash, State's Atty., Austin, for the State.

## OPINION

McCORMICK, Presiding Judge.

Appellant was convicted of the offense of capital murder under V.T.C.A., Penal Code, Section 19.03(a)(2).[1] The jury answered the special issues affirmatively and punishment was assessed accordingly at death. Article 37.071(b), V.A.C.C.P.[2] Appellant's conviction was affirmed on direct appeal. *Banda v. State*, 768 S.W.2d 294 (Tex.Cr.App.), cert. denied, 493 U.S. 923, 110 S.Ct. 291, 107 L.Ed.2d 270 (1989). We granted appellant's writ of habeas corpus and this judgment was vacated due to ineffective assistance of counsel on appeal. *Ex parte Banda*, No. 21,327–02 (Tex.Cr.App., October 21, 1992) (not designated for publication). Appellant was granted this out-of-time appeal and he raises twenty-six points of error. We will affirm.

## Sufficiency of the Evidence

In his twenty-fifth point of error, appellant contends that the evidence is insufficient to establish his guilt. Viewed in the light most favorable to the verdict, the evidence at trial established the following: On the evening of August 2, 1986, appellant and his brother, Juan "Johnny" Banda, had been playing poker and drinking beer at the home of a friend in Hamilton. After about four hours, appellant and Johnny returned home, where they continued to drink beer with some other friends, including Brenda Hunter and another of appellant's brothers, David. After everyone except he and Johnny had left, appellant talked about needing some money. Johnny mentioned an old lady who owned some rent houses who he thought might have some money. The brothers went over to the victim's home, knocked on the door, and when the woman opened it, appellant hit her, knocking her to the floor, while Johnny looked for something to steal.

Sometime after midnight, appellant arrived at the home of his sister, Amelia Sabedra, who lived approximately one and a half blocks from Laird's home. Amelia's husband, Jesse, answered appellant's knocking and let him into the house. Appellant went into his sister's bedroom and told her that she needed to take him to Comanche because he had just killed an old lady and a man who tried to defend her. Appellant then told

---

1. Appellant was indicted and charged with murder in the course of aggravated sexual assault and murder in the course of burglary. The jury returned a general verdict of guilt.

2. Unless otherwise indicated, all references to articles are to those in the Texas Code of Criminal Procedure.

Amelia that if she did not believe him then she should look at the scratches on his face and neck. She also noticed that his shirt had smeared blood on it. The Sabedras agreed to take appellant to Comanche.

Before getting into the Sabedra's truck, appellant said that he had sold his soul to the devil, that the devil had told him to kill six people, and that he had to kill four more. While en route to Comanche, appellant further stated that he had stabbed "the old lady" twenty or thirty times, that blood was coming out of her mouth, and that he had sucked the blood out of her mouth into his own. Amelia stated that appellant was acting strange, "doing like witchcraft." Appellant then took a bunch of bills from his pocket and asked Amelia if she wanted fifty dollars. He told her that the money was Satan's and if he did not spend the money it would go away. He tossed a bill at Amelia, but she would not take it. She was unable to see the denomination of the bill in the dark truck.

The Sabedras took appellant to their cousin, Elvira Liendo's, home in Comanche. It was between 4:00 and 4:30 a.m. Amelia asked Liendo if appellant could stay at her home while she and Jessie went to call her parents in Lubbock. When appellant went to the restroom, the Sabedras left. When appellant realized they had left without him, he became angry and told Liendo that he would put a spell on them. He told Liendo that he killed an old lady. He further told his cousin Johnny, Liendo's brother, that he had sold his soul to the devil. Appellant eventually decided he wished to change shirts and threw his shirt by the door. When Liendo and Johnny gave him a white shirt to wear, appellant said he did not want a white shirt because the cops would catch him quicker. However, appellant put the shirt on anyway.

In the meantime, after calling appellant's mother in Lubbock, the Sabedras went to the Comanche Sheriff's Office and relayed their story to Comanche Police Officer Mark McDonald. Officer McDonald arrived at the Liendo residence at 4:52 a.m. to check out the situation. Upon his arrival, appellant, still wearing the white shirt, ran out the back

door. McDonald pursued him, but lost him in the next yard. McDonald returned to the Liendo home and Liendo gave him appellant's bloodied shirt. Back-up units were called and a search for appellant ensued. Following an extensive search, McDonald went back to the Liendo home again to see if appellant had returned. McDonald found appellant lying down on the back porch without his shirt. The white shirt was later found behind a trash can. McDonald arrested appellant and transported him to the Comanche jail where he was booked for public intoxication. When Jailer Beth White was attempting to put appellant into the "drunk tank" to sober up, appellant stated, "Don't put me in the cell with anybody. I'll kill them. It won't bother me to kill them, I have already killed somebody." He then told her that he had stabbed someone to death in Hamilton.

The body of the seventy-four-year-old decedent was discovered at approximately 9:40 a.m. that morning. The home was in disarray and drawers had been dumped out. Dr. M.G.F. Gilliland, Medical Examiner for Dallas County, performed the autopsy. Gilliland testified that the decedent had been sexually assaulted, had various lacerations and abrasions all over her body, and died as a result of strangulation. She further testified that it was her opinion that the decedent's death was intentional and deliberate.

The blood removed from appellant's shirt, jeans, and underwear by a forensic serologist was determined to be type B blood, which was the same type as the decedent's. Appellant had type A blood. Seminal fluid found on the decedent's pubic hair and saliva found on her breasts were consistent with appellant's blood type. Further, a towel found at the scene also contained blood consistent with appellant's. The trace evidence analyst testified that a loose pubic hair removed from the deceased's hip had the same characteristics as appellant's pubic hair.

In reviewing a sufficiency question, we must view the evidence in the light most favorable to the verdict and determine whether any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Jackson v. Vir-*

*ginia,* 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979); *Butler v. State,* 769 S.W.2d 234, 238 (Tex.Cr.App.1989). Because the State's case is based on circumstantial evidence and was tried prior to this Court's decision in *Geesa,*[3] we will use the "exclusion of reasonable hypothesis" approach as the method for analyzing the sufficiency. *Garrett v. State,* 682 S.W.2d 301, 304 (Tex.Cr.App.1984), cert. denied, 471 U.S. 1009, 105 S.Ct. 1876, 85 L.Ed.2d 168 (1985). It is not necessary that every fact point directly and independently to the defendant's guilt. *Russell v. State,* 665 S.W.2d 771, 776 (Tex.Cr.App.1983), cert. denied, 465 U.S. 1073, 104 S.Ct. 1428, 79 L.Ed.2d 752 (1984). It is enough if the conclusion is warranted by the combined and cumulative force of all the incriminating circumstances. *Id.*

Appellant contends that the evidence was not sufficient to establish beyond a reasonable doubt either that appellant was responsible for the murder of Laird, or that he committed either of the underlying felonies. He argues that the evidence shows appellant's brother, Juan "Johnny" Banda, was the perpetrator of the crime. Appellant supports this hypothesis with the following evidence at trial: Appellant and Johnny have the same blood type. Johnny knew where Laird lived, used to rent from her, and knew when tenants paid their rent. Johnny also had scratches and bruises on his body and stated at one time that he had gone to Laird's home with appellant, although he later denied the event. Johnny was unemployed at the time of the murder. Appellant confessed he killed two people, but only one body was found.

■ The jury is the exclusive judge of the credibility of witnesses and of the weight to be given their testimony. *Lafoon v. State,* 543 S.W.2d 617, 620 (Tex.Cr.App.1976). Appellant's argument that Johnny was the real perpetrator of the crime was apparently rejected by the jury. The test for circumstantial evidence does not permit our alteration of the evidence to fit the hypothesis; obviously there will always be a hypothesis of innocence if inculpatory evidence may be rejected. *Girard v. State,* 631 S.W.2d 162, 164

(Tex.Cr.App.1982). We must hold the evidence sufficient if the exculpatory aspects of appellant's version of events necessarily contradict or conflict with inculpatory inferences drawn from other circumstantial evidence presented by the State, and when all the evidence viewed in the light most favorable to the verdict would rationally support a jury verdict of guilt to a degree of confidence beyond a reasonable doubt. *Gunter v. State,* 858 S.W.2d 430, 439 (Tex.Cr.App.), cert. denied, —— U.S. ——, 114 S.Ct. 318, 126 L.Ed.2d 265 (1993).

■ The combined and cumulative force of all the incriminating circumstances leads us to conclude that there was sufficient evidence for a rational trier of fact to conclude beyond a reasonable doubt that appellant was guilty of capital murder, and to exclude every other reasonable hypothesis except for that of guilt. *Russell,* 665 S.W.2d at 776; *Johnson v. State,* 803 S.W.2d 272, 280 (Tex.Cr.App. 1990), cert. denied, 501 U.S. 1259, 111 S.Ct. 2914, 115 L.Ed.2d 1078 (1991), *overruled on other grounds, Heitman v. State,* 815 S.W.2d 681 (Tex.Cr.App.1991).

Appellant's twenty-fourth point of error contends that the evidence was insufficient for the jury to make an affirmative finding that he would be a "continuing threat to society." Article 37.071(b)(2) (second special issue). He argues that his youth, intoxication, the participation of his brother, and the fact that he had no history of violence mitigated the severity of his offense.

■ In reviewing the sufficiency of the evidence at the punishment phase, we again view the evidence in the light most favorable to the verdict and determine whether any rational trier of fact could make the finding beyond a reasonable doubt. *See Stoker v. State,* 788 S.W.2d 1, 7 (Tex.Cr.App.1989), cert. denied, 498 U.S. 951, 111 S.Ct. 371, 112 L.Ed.2d 333 (1990). The burden was on the State to prove the punishment issues beyond a reasonable doubt. Article 37.071(c). A jury is permitted to consider a variety of factors when determining whether a defen-

---

**3.** *Geesa v. State,* 820 S.W.2d 154 (Tex.Cr.App. 1991).

dant will pose a continuing threat to society.[4] *See Keeton v. State,* 724 S.W.2d 58, 61 (Tex. Cr.App.1987).

In its determination of the special issues, the jury was entitled to consider all the evidence presented at the guilt/innocence phase of the trial, in addition to the evidence presented at the punishment phase. *Valdez v. State,* 776 S.W.2d 162, 166–67 (Tex.Cr.App. 1989), cert. denied, 495 U.S. 963, 110 S.Ct. 2575, 109 L.Ed.2d 757 (1990). The circumstances of the offense and the events surrounding it may be sufficient in some instances to sustain a "yes" answer to the second special issue. *See Vuong v. State,* 830 S.W.2d 929, 935 (Tex.Cr.App.), cert. denied, —— U.S. ——, 113 S.Ct. 595, 121 L.Ed.2d 533 (1992); *Stoker,* 788 S.W.2d at 7.

The evidence in the instant case revealed that appellant murdered a seventy-four-year-old widow by strangling her in the course of sexually assaulting and robbing her. Decedent had been beaten, her lip split open, and she had been violently raped while she was still alive. Decedent obviously resisted her attacker. The evidence also showed that appellant made sexual advances towards a female acquaintance earlier the same evening. When she rebuffed him, he threw her up against a wall and tried to kiss her. Further, appellant repeatedly told his family members that he had killed and that Satan told him that he had to kill at least four more people. Although we hesitate to conclude that this evidence alone would support a finding of future dangerousness, the State presented more.

At the punishment phase of trial, the State introduced the following evidence: (1) Debbie Galindo May testified that she saw appellant drawing a picture of Christ with a crown of thorns and horns coming out of his head prior to the murder; (2) appellant pulled a knife on Brenda Hunter two months before the murder because she and another woman pretended that they were sisters; (3) appellant obtained a one-half by three inch tattoo of the word "Satan" on the top of his left wrist following the murder; (4) appellant was arrested for burglary in Travis County and sentenced to three years, probated in the spring of 1983; (5) appellant was sentenced to five years for burglary of a building in Coryell County in November, 1983; (6) appellant pleaded guilty to the offense of unauthorized use of a motor vehicle in 1985; (7) Dr. James Grigson, a psychiatrist, testified, based upon a hypothetical that substantially tracked the facts of the instant case, that appellant would be a future danger to society.

We conclude there was sufficient evidence to support the jury's affirmative finding that there was a probability that appellant would be a continuing threat to society. Further, the case law relied upon by appellant is distinguishable from the instant case. *See Flores v. State,* 871 S.W.2d 714 (Tex.Cr.App. 1993). Appellant's twenty-fourth point of error is overruled.

## Pretrial Motions

In his first point of error,[5] appellant contends that the trial court erroneously found that there was probable cause to arrest him for public intoxication. He argues that he was not subject to arrest for public intoxication because he was drunk in the yard of his cousin's private house. Specifically, he claims that the officer did not see him in a public place.

At a suppression hearing, the trial court is the sole judge of the credibility of witnesses and the weight of their testimony. *Romero v. State,* 800 S.W.2d 539, 543 (Tex. Cr.App.1990). We do not engage in our own factual review. If the record supports the

---

**4.** Among those factors are: (1) the circumstances of the capital offense, including the defendant's state of mind and whether he was working alone or with other parties; (2) the calculated nature of the defendant's acts; (3) the forethought and deliberateness exhibited by the crime's execution; (4) the existence of a prior criminal record, and the severity of the prior crimes; (5) the defendant's age and personal circumstances at the time of the offense; (6) whether the defendant was acting under duress or the domination of another at the time of the offense; (7) psychiatric evidence; and (8) character evidence. *Keeton,* 724 S.W.2d at 61.

**5.** The remaining points of error will be addressed in the order in which they occurred at trial.

trial court's findings, we are not at liberty to disturb them. *Johnson v. State*, 803 S.W.2d 272, 287 (Tex.Cr.App.1990), cert. denied, 501 U.S. 1259, 111 S.Ct. 2914, 115 L.Ed.2d 1078 (1991). On appellate review, we consider only the question of whether the trial court improperly applied the law to the facts. *Romero v. State*, 800 S.W.2d at 543.

An individual commits the offense of public intoxication if he appears in a public place under the influence of alcohol or any other substance to the degree that the individual may endanger himself or another. *See* V.T.C.A., Penal Code, Section 42.08(a). In determining whether the officer had probable cause to arrest appellant for public intoxication, the question before us is whether the officer's knowledge at the time and under the circumstances would warrant a prudent person's belief that appellant had committed or was committing the offense. *Britton v. State*, 578 S.W.2d 685, 689 (Tex.Cr.App.1978), cert. denied, 444 U.S. 955, 100 S.Ct. 435, 62 L.Ed.2d 328 (1978).

Officer McDonald, the arresting officer, testified that the facts known to him at the time of the arrest were the following: (1) appellant's sister had informed him that appellant had claimed to have killed some people and said he had to kill more people; (2) appellant's sister had described appellant as being drunk and having what appeared to be blood all over him; (3) the persons at the residence in Comanche were afraid of appellant and had asked the officer to take him into custody; (4) when McDonald arrived at the Liendo residence, a man ran out the back door and jumped over the fence into a neighbor's yard; (5) he was informed by appellant's family members that the man fleeing was appellant; (6) McDonald pursued appellant into the neighbor's yard but lost him at the next fence; (7) McDonald searched the neighbor's yard, returned to the Liendo home and searched that yard, then searched around three or four more houses in the immediate area; (8) McDonald then called other officers for assistance; (9) the officers *searched yards surrounding* the Liendo home, looked in backyards and bushes, and searched a vacant house; (10) the officers then began searching the streets north of the Liendo home because that was the direction appellant had run; (11) McDonald and another officer searched around a hospital three or four blocks from the Liendo home; (12) the two officers searched alleys, corners, and around some buildings in the neighborhood of the hospital; (13) after searching for approximately one hour, McDonald decided to go back to the Liendo residence to see if appellant might have returned; (14) upon his arrival, McDonald found appellant in the Liendo backyard to the side of the house.

Appellant contends that because he was in the side yard of a private residence when he was arrested, there was no probable cause then existing to arrest him for public intoxication. Appellant does not contend that he was not intoxicated or a danger to himself or others. Therefore, we must determine if the arresting officer had probable cause to believe appellant had appeared intoxicated in a public place. A public place is any place to which the public or a substantial group of the public has access and includes but is not limited to streets, highways, and common areas of schools, hospitals, apartment houses, office buildings, transport facilities and shops. V.T.C.A., Penal Code, Section 1.07(a)(29). A place may be a public one or not according to the circumstances. See *Clinton v. State*, 64 Tex.Cr.R. 446, 142 S.W. 591 (1912). Officer McDonald saw appellant climb over a fence and disappear. His personal search caused him to believe that appellant was not in the neighborhood surrounding the residence. To hold that there was no probable cause to arrest appellant for public intoxication merely because he was later found in the sideyard of his cousin's private residence would be unreasonable, and we decline to do so.

In our view, based upon the evidence before the trial court, the inferences the trial court could draw from the record are enough to support a finding that appellant appeared in a public place during his absence and that there was probable cause to arrest appellant

for public intoxication. We overrule appellant's first point of error.[6]

In appellant's second and third points of error, he complains that the trial court erred in overruling his motion to change venue. He argues that the trial court violated his right to a fair trial under federal and state law. Appellant's motion and supporting affidavits alleged that he would not be able to obtain a fair and impartial trial in Hamilton County due to prejudice existing in the community. These facts were contested by the State.

A change of venue is proper and consistent with principles of due process when a defendant demonstrates his inability to obtain an impartial jury or a fair trial at the place of venue. *See Groppi v. Wisconsin,* 400 U.S. 505, 510, 91 S.Ct. 490, 27 L.Ed.2d 571 (1971); *see also Henley v. State,* 576 S.W.2d 66, 69 (Tex.Cr.App.1978). However, publicity in the news media does not establish prejudice or require a change of venue per se. *See Johnson v. State,* 773 S.W.2d 322, 324 (Tex.Cr.App.1989), *affirmed in part, Johnson v. Texas,* — U.S. —, 113 S.Ct. 2658, 125 L.Ed.2d 290 (1993); *Beets v. State,* 767 S.W.2d 711, 743 (Tex.Cr.App.1987). The test is "whether outside influences affecting the community's climate of opinion as to a defendant are inherently suspect." *See Beets,* 767 S.W.2d at 742.

At the venue hearing, appellant presented six witnesses. Only two of appellant's witnesses testified that they were of the opinion that appellant could not get a fair trial in Hamilton County because of the media coverage and because of what they had heard expressed from several persons in the town of Hamilton. One of these witnesses had not lived in Hamilton County since one week after the murder. The record reflects that only three articles appeared in the *Hamilton Herald News* in the nine months preceding the hearing. None of these articles was offered as evidence. Further, appellant presented no evidence of prejudice in the seven other communities that comprise Hamilton County. In rebuttal, the State called a number of witnesses from various parts of Hamilton County who expressed the opinion that appellant could obtain a fair and impartial trial locally. The trial court overruled appellant's motion for a change of venue.

When a trial court is presented with a motion to change venue, the trial judge must act as a factfinder with regard to the issue presented. *See* Article 31.04; *Hathorn v. State,* 848 S.W.2d 101, 109 (Tex.Cr. App.1992), cert. denied, — U.S. —, 113 S.Ct. 3062, 125 L.Ed.2d 744 (1993). The trial judge is in a better position to resolve such issues as a result of his ability to observe the demeanor of witnesses and scrutinize their veracity. Consequently, we will affirm the trial court's judgment absent evidence of an abuse of discretion. *Id.* We conclude that the trial court did not abuse its discretion in overruling appellant's motion for change of venue. Appellant's second and third points of error are overruled.

### Voir Dire

In points of error four through eight, appellant maintains that the trial court erred in refusing to sustain his challenges for cause of seven veniremembers. Appellant used a peremptory strike to exclude each of the challenged veniremembers. Appellant exhausted all his peremptory challenges and was granted two additional peremptory strikes. After his request for more peremptory strikes was denied, appellant had to accept an objectionable juror. Error, if any, was preserved. *Demouchette v. State,* 731 S.W.2d 75, 83 (Tex.Cr.App.1986), cert. denied, 482 U.S. 920, 107 S.Ct. 3197, 96 L.Ed.2d 685 (1987).

The denial or grant of a challenge for cause is within the discretion of the trial court, and will not be overturned absent an abuse of that discretion. *Mooney v. State,* 817 S.W.2d 693, 701 (Tex.Cr.App.1991). We examine the record as a whole to determine whether there is support for the trial court's decisions, and, in doing so, give great defer-

---

6. Appellant also contends that the officer did not have probable cause to arrest him for being in a suspicious place under such circumstances that would show he was guilty of a felony or breach of the peace. Article 14.03. Because we have resolved the point of error on other grounds, we do not reach this contention.

ence to the trial court. *Satterwhite v. State,* 858 S.W.2d 412, 415 (Tex.Cr.App.), cert. denied, —— U.S. ——, 114 S.Ct. 455, 126 L.Ed.2d 387 (1993). This is especially true when this Court is faced with a vacillating or equivocating venireperson. *Id.* The trial court is able to consider important factors such as demeanor and tone of voice that do not come through when reviewing a cold record. *Mooney,* 817 S.W.2d at 701.

In point of error four, appellant argues that prospective jurors Turner and Thompson stated that they could not consider voluntary intoxication in mitigation of punishment. He contends that because voluntary intoxication has mitigating qualities that Turner and Thompson were biased against law upon which he was allowed to rely. *See* Article 35.16(c)(2).

█ It is not error for a trial court to overrule a challenge for cause where it is shown that a juror will not or may not give a particular variety of mitigating evidence any consideration. *Johnson,* 773 S.W.2d at 331; *Allridge v. State,* 850 S.W.2d 471, 482 (Tex. Cr.App.1991), cert. denied, —— U.S. ——, 114 S.Ct. 101, 126 L.Ed.2d 68 (1993). This Court has stated:

> "In Texas, this mitigating evidence is admissible at the punishment phase of a capital murder trial. Once admitted, the jury may then give it weight, if in their individual minds it is appropriate, when answering the questions which determine sentence. However, '[t]he amount of weight that the factfinder might give any particular piece of mitigating evidence is left to "the range of judgment and discretion" exercised by each juror.'" *Johnson,* 773 S.W.2d at 331 (citations omitted).

█ During voir dire, both Turner and Thompson at one point stated that they would not consider voluntary intoxication to be a mitigating factor. However, both did say that they would follow the court's instructions.

Neither Turner nor Thompson was shown to have a bias or prejudice against the law. The mere fact that they each acknowledged that they believed such evidence deserves little or no weight does not create a sustaina-ble challenge for cause under Article 35.16. *Id.; Allridge,* 850 S.W.2d at 482. Appellant's fourth point of error is overruled.

In his fifth point of error, appellant complains that the trial court erroneously refused to remove venireperson Howard Hightower for cause after he unequivocally stated during voir dire that he would presume a "yes" answer to the first special issue question during the punishment phase of trial.

The following relevant testimony was elicited at voir dire:

[By Defense Counsel]: "What I'm asking you is if you get through the first part of it—was close to what you had figured out, but what I'm saying is would you—would you start out in that second part of the trial—you know, you got through the first part, you and eleven other people found him guilty beyond a reasonable doubt of capital murder. Would you start out into that second part of the trial thinking they probably ought to be yes, and you will have to look at what evidence to see if they might be answered no? Would you lean toward answering them yes to begin with, is what I'm asking.

"A. No.

 * * * * * *

"Q. Okay. Well, we're talking about the sentencing part, which is the second part. Basically, what is important to you? What kind of things do you want to hear about? How do you decide whether it should be—the questions should be answered yes or no? What things would go into your mental processes to help you answer those?

"A. The first question should have been answered already, it would look to me like.

"Q. Okay. But with regard to the first question, you would have your mind made up by the time you got to the second part [sic] the trial; is that what you are saying?

"A. No.

 * * * * * *

"A. I don't—I'm not sure what you're asking me, but I think that I couldn't

have voted that the person was guilty if I didn't see from the evidence that they had committed the crime deliberately. Is that what you're asking?

"Q. Well, I just—I wasn't clear about what you meant when you said that, so I just wanted you to clarify that for me, and I believe you have."

 On two separate occasions venireperson Hightower stated that he would not automatically answer the first special issue, "yes". Only after further questioning by the defense attorney does he appear to be confused as to his response. This, at best, shows that venireperson Hightower was equivocating as to his answer to the first special issue. In evaluating a prospective juror's response, we recognize that we are faced with a cold record and we, therefore, give deference to the trial judge who was in a position to hear and see the potential juror. *Alexander v. State,* 866 S.W.2d 1, 7 (Tex.Cr. App.1993). It is not error on the part of the trial court to deny a challenge for cause to a veniremember who gives equivocal answers on whether or not he would automatically say "yes" to one of the punishment issues. *Id.* Therefore, we defer to the trial court's judgment in overruling appellant's challenge for cause. Point of error five is overruled.

 In point of error six, appellant contends that prospective juror Keeter could not consider the full range of punishment for the lesser-included offense of murder. Qualified prospective jurors must be willing to consider the full range of punishment applicable to the offense submitted for their consideration. *Fuller v. State,* 829 S.W.2d 191, 200 (Tex.Cr. App.1992), cert. denied, —— U.S. ——, 113 S.Ct. 2418, 124 L.Ed.2d 640 (1993). A person who testifies unequivocally that he could not consider the minimum sentence as a proper punishment for the lesser-included offense of murder is properly the subject of a challenge for cause. *See Pierce v. State,* 696 S.W.2d 899, 902 (Tex.Cr.App.1985).

 Defense counsel asked Keeter whether he could consider a five-year sentence for someone found guilty of murder. At one point, he said that he could not. However, upon further questioning by both defense counsel and the prosecution, Keeter stated that he could consider five-years imprisonment depending on the facts and circumstances of the case:

"[Defense Counsel]: When you go back in there to consider what his proper punishment would be, can you conceive of any fact where you might think five years is a proper punishment?

"A. Well, after hearing all the facts, if the law called for—well, five years or more, say five to ninety-nine or whatever the law calls for, yes, in certain cases, you know, maybe not in all cases, but in certain cases that, you know. . . ."

After reviewing the voir dire of this prospective juror, we conclude the trial court correctly overruled appellant's challenge for cause. Point of error six is overruled.

 In his seventh point of error, appellant asserts that prospective jurors Raibourn and Glidewell would require appellant to present evidence to demonstrate that he was not guilty. He specifically maintains: (1) that Raibourn would not presume appellant's innocence because the indictment alone means appellant must have done something wrong; and (2) that Glidewell believed that the side that put on the most evidence should "win". A veniremember who is unwilling to afford a defendant the presumption of innocence is challengeable for cause. *See* Article 35.16(c)(2).

*Prospective Juror Raibourn:*

[By Prosecution]: "Okay. Now, then, of course, having served as a Grand Juror before, you realize that an indictment is— is merely the instrument by which a case is brought to Court?

"A. Yes.

"Q. All right. And as a one time previous petit jury—juror you also realize that should be given no weight as evidence, should it?

"A. No, sir.

 * * * * * *

"Q. Okay. Would you require him to put on any evidence—

"A. No, sir—

"Q. —to disprove that he's guilty?

"A. No, sir.

\* \* \* \* \* \*

[By Defense Counsel]:

"Okay. Okay. You understand, do you not, that a—an indictment is not any proof of guilt, do you not?

"A. Yes, sir, I do.

"Q. Do you—by virtue of the fact that [appellant's] here on trial, do you assume that he must have done something wrong; otherwise, he wouldn't be here on trial?

"A. Yes, sir.

"Q. Okay. And now, what kind of evidence would he have to come forth with to convince you that he did nothing wrong?

"A. Well, it would have to be proven that he did, not necessarily any evidence that he didn't.

\* \* \* \* \* \*

[By Prosecution]:

"And, of course, as a former Grand Juror, you realize that—that there must have been some evidence presented to that body, do you not?

"A. Yes, sir. Yes, sir.

\* \* \* \* \* \*

"Q. Is that what you meant when you said a while ago—and I forget what the exact answer was, but something to the effect of, you know, he must have done something wrong; otherwise, he wouldn't have been here?

"A. Yes, sir, that's what I meant.

"Q. In other words, that a Grand Jury heard something?

"A. Yes, sir.

"Q. All right. Now, of course, you said— are you going to take that as a circumstance against the Defendant?

"A. No, sir."

There is no evidence in the record that prospective juror Raibourn ever asserted that he made any presumption as to appellant's guilt; in fact, Raibourn's statements seem to be to the contrary. The trial court correctly overruled appellant's challenge for cause.

*Prospective Juror Glidewell:*

[By Defense Counsel]:

"And you stated earlier, I believe, that as long as—as [appellant] can come forth with at least as much evidence as the State does, that you are going to— that you would vote not guilty; is that right?

"A. If he has more evidence than the State, I would vote not guilty.

"Q. Okay. In other words, he would have to present more evidence to you to get you to vote not guilty than the State?

"A. Right."

At this point, the trial court instructed Glidewell as to the burden of proof on the State and that the defendant is not required to come forward with any evidence. Glidewell acknowledged the judge's instructions and stated that she could follow the law. The following was then elicited:

"Q. Let me ask this question. I just want to clear it up, if we can. If I'm wrong, you—you tell me I'm wrong, but as I understand it, somebody has made a statement to you that this Defendant admitted the accusation, that's the accusation that's been made against him.

Now, you don't know whether that's true or not?

"A. That's right.

"Q. But to resolve that matter, you're going to listen to the testimony and evidence that the State brings you, and then, if the Defendant fails to bring you any evidence on that matter, then you feel like you should have to find him guilty?

"A. If they can't prove he's—he's guilty, no, I won't find him guilty.

\* \* \* \* \* \*

"Q. Okay. And you're not going to make him bring you—bring any evidence up?

"A. They're going to have to prove he's guilty.

\* \* \* \* \* \*

"A. If they can't prove he's guilty, well, he'll be—he'll be innocent. They got to prove he's guilty.

"Q. Okay. So you won't require the Defendant, then, to produce any evidence at all?

"A. I don't reckon.

\* \* \* \* \* \*

"Q. What if the State doesn't produce any evidence? What if he doesn't produce any evidence, then where are we?

"A. Be a mistrial, I reckon, if there's not any evidence produced on any side.

\* \* \* \* \* \*

[By Prosecution]:

"Okay. If the State didn't put on any evidence at all, do you reckon we would have proved the case beyond a reasonable doubt?

"A. If you didn't put on any evidence, yes.

"Q. Okay. So what would you have to do there?

"A. Find him not guilty."

Although venireperson Glidewell seemed to state at one point that appellant had a burden to bring forth evidence, she stated that she could follow the law, did not presume appellant to be guilty, and did not require appellant to put on evidence. The trial court could reasonably have found that her testimony as a whole did not reflect a bias against the law. Point of error seven is overruled.

■ In appellant's eighth point of error, he complains that prospective juror Bowden stated that he would presume a "yes" answer to the first two special issues if he found appellant guilty of capital murder. Where a veniremember would automatically answer one or more of the special issues in the affirmative, he or she is challengeable for cause. *See Cooks v. State,* 844 S.W.2d 697, 712 (Tex.Cr.App.1992), cert. denied, —— U.S. ——, 113 S.Ct. 3048, 125 L.Ed.2d 732 (1993). The pertinent portion of the record follows:

[By Defense Counsel]:

"Okay. And what my question is—is if you were going into that second part of the trial, after you and eleven other people had convicted some one of capital murder, would you have a presumption in your mind already that those first two questions should be answered yes?

\* \* \* \* \* \*

"A. Yes, I think I could. I think I would at that portion of the trial.

\* \* \* \* \* \*

"Q. So would this presumption that would be raised by that—do you feel like that would cause you to require something of the accused to remove that presumption? Would you want to hear his side of the story to remove the yes answer that started forming in your mind during the first part of the trial?

"A. No, I don't believe so. I believe that if—if I hold to what I try to do, which is innocent until proven otherwise, if—if I can honestly answer the first two questions yes, then it has been proved to me.

\* \* \* \* \* \*

"Q. So you will never see these two questions, unless, first of all, you were on a jury that convicted someone of capital murder, and then got to the second part where the jury assesss [sic] the sentence, so what I'm asking is if you and eleven other people found someone guilty beyond a reasonable doubt of capital murder—okay—then you would already be forming yes answers to these two questions based on what you heard in the first part; is that correct?

"A. Yes.

\* \* \* \* \* \*

"THE COURT: Well, you're not going to have these questions before you, Mr. Bowden, until we get to the punishment phase of the trial.

Do you understand that?

"A. Yes, sir.

"THE COURT: All right. And so you can't properly have formed any opinion on—on what those answers will be until you get to that phase of the trial.

Do you understand?

"A. Yes, sir.

\* \* \* \* \* \*

"THE COURT: Let me interrupt. Just—I want to get this part of it cleared up before we go any further.

Mr. Bowden, do you think your presumption in your mind is going to be based on what evidence you have heard in the first part of the trial?

"A. Yes, sir.

\* \* \* \* \* \*

"Q. Okay. Again, Mr. Bowden, are you going to require something of the accused at the—in rebutting your answer that you had started forming during the first part of the trial, if we get to that point?

"A. No, sir. I'm not going to require anything of the accused.

"Q. Okay. but if he doesn't present any evidence in that second part of the trial, are you going to give the State a head start on their proving it beyond a reasonable doubt based on your presumption?

"A. I don't know that it would be a head start. I'll just—I will take the information that is—as I perceive it."

The trial court overruled appellant's challenge for cause:

"Well, the word presume that you kept using was your word, not his, and I think Mr. Bowden clearly understood that he couldn't presume anything, all he would be doing is be using what evidence he had in the first phase of the trial, so you cause challenge will be denied."

██ As stated previously, great deference is given to the trial judge who was present to observe the demeanor of the prospective juror. *Mooney*, 817 S.W.2d at 701. Although some of Bowman's testimony indicated that he would presume "yes" answers to the special issues, the record contains sufficient evidence to the contrary. We will defer to the ruling of the trial court. *See Cooks*, 844 S.W.2d at 713–15. Appellant's eighth point of error is overruled.

**Guilt/Innocence Phase**

██ In point of error twelve, appellant posits that the trial court erred by allowing State's witness Brenda Hunter to testify over objection about an extraneous offense on direct examination. Appellant asserts that the evidence of his attempts to kiss Hunter against her will was highly prejudicial in both phases of the trial.

This issue has already been addressed by this Court. *Banda, supra.* Despite appellant's assertion, this Court did not overrule his point of error merely because he did not make a proper argument on his first appeal. After a careful review of the record, Judge Clinton writing for this Court held:

"While we see minuscule, if any, probative value in the evidence, neither do we discern prejudice such that appellant would have been deprived of a fair trial. In short, we cannot conceive how the evidence could have contributed in any respect, legitimately or not, to the conviction or punishment of appellant. Any error in admission was therefore harmless." *Banda*, 768 S.W.2d at 296.

We adhere to this view. Appellant's point of error is overruled. *Granviel v. State*, 723 S.W.2d 141, 147 (Tex.Cr.App.1986); *Harris v. State*, 790 S.W.2d 568, 579 (Tex.Cr.App. 1989).

Appellant's thirteenth point of error complains that the trial court erred by allowing Texas Ranger Fred Cummings to state that the police had insufficient evidence to hold Johnny Banda for the instant offense. Appellant, at trial, specifically asserted that Cummings was not qualified to testify whether there was enough evidence to charge Johnny. He states that Cumming's testimony was an inadmissible legal conclusion. The State counters that the officer was an expert witness and his opinion was therefore admissible.

██ The Rules of Criminal Evidence govern the admissibility of expert testimony. If the trial court finds that the witness has a specialized skill, training, or other knowledge, and finds that his testimony will assist the trier of fact to understand the evidence or to determine a fact issue, then such testi-

mony is admissible. Tex.R.Crim.Evid. 702. The admission of such testimony lies within the sound discretion of the trial court and will not be set aside absent a showing of abuse of that discretion. *Steve v. State*, 614 S.W.2d 137, 139 (Tex.Cr.App.1981).

▮▮▮▮ Appellant's defense was based on the theory that Johnny Banda and not appellant committed the crime in this case. Appellant elicited during his cross-examination of Johnny that Johnny was not charged with the instant offense. On direct examination, the State asked Texas Ranger Cummings whether there was sufficient evidence to charge Johnny. Cummings said no. Prior to this the State questioned Cummings about his qualifications as a criminal investigator: he had been in the Texas Rangers since 1979, he had a total of nineteen years service with the Department of Public Safety, his main duty as a Texas Ranger was to perform criminal investigations, and he had approximately 2,000 hours training in criminal investigation since 1968. Cummings further stated that it was part of his duties to make determinations about whether there was sufficient evidence for a case to go forward. Cummings did not comment on whether Johnny was or was not involved in the crime, but merely explained why he was not charged. The trial court overruled appellant's objection to the testimony and stated that Cummings had to make these decisions every day.

At the guilt/innocence phase, one of the main issues was who committed the crime. Appellant's main defense was that Johnny was the perpetrator. Ranger Cummings testimony clarified why Johnny Banda had not been charged. We hold that the trial court did not abuse its discretion in finding Cum-

mings to be qualified and admitting the testimony.[7] Point of error thirteen is overruled.

In his ninth point of error, appellant alleges that his trial counsel was ineffective.[8] He argues that because Johnny Banda accused him of attempting to suborn perjured testimony from Amelia and Jesse Sabedra, his attorney had a conflict of interest that affected his performance.[9] After reviewing appellant's arguments and the record, we overrule appellant's point of error on grounds that he fails to meet the heavy burden required to prove ineffective assistance of counsel as required by *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984).

▮▮▮▮ *Strickland* announces the standard for testing claims of ineffective assistance of counsel.[10] A claimant must prove that counsel's representation so undermines the "proper functioning of the adversarial process that the trial cannot be relied on having produced a just result." *Id.* at 686, 104 S.Ct. at 2063. Appellant must prove: 1) that his counsel's representation was deficient; and 2) that the deficient performance was so serious that it prejudiced his defense. *Id.* at 687, 104 S.Ct. at 2064. This means appellant must prove by a preponderance of the evidence that counsel's representation fell below the standard of prevailing professional norms and that there is a reasonable probability that but for counsel's deficiency the result of the trial would have been different. *McFarland v. State*, 845 S.W.2d 824, 842 (Tex.Cr.App. 1992), cert. denied, —— U.S. ——, 113 S.Ct. 2937, 124 L.Ed.2d 686 (1993).

▮▮▮▮ The review of counsel's representation is highly deferential and indulges a strong presumption that counsel's conduct

---

7. Appellant also stated that Cummings' testimony created harmful error because appellant's entire defense was based on the theory that Johnny was responsible for the crime. In order to sustain appellant's argument, this Court would have to hold that no witness, lay or expert, could ever give testimony that refutes a defensive theory. We decline to do so.

8. Appellant argues a violation of the Sixth and Fourteenth Amendments to the United States Constitution and Art. I, Sec. 10 of the Texas Constitution.

9. Johnny stated that defense counsel told Amelia to say that her written statement was untrue and tried to get Jesse to testify that he had burned Johnny's clothes.

10. Texas has adopted the *Strickland* test for challenges based on state law, applying it in capital murder cases to both the guilt/innocence and punishment stages of trial. *Hernandez v. State*, 726 S.W.2d 53, 57 (Tex.Cr.App.1986), and *Craig v. State*, 825 S.W.2d 128, 129 (Tex.Cr.App.1992).

falls within a wide range of reasonable representation. *Strickland,* 466 U.S. at 689, 104 S.Ct. at 2065. The burden is on appellant to overcome the presumption. *Id.*

In order to meet the *Strickland* standard in a conflict of interest case, appellant must show first that defense counsel "actively represented conflicting interests" and that "an actual conflict of interest adversely affected his lawyer's performance." *Strickland,* 466 U.S. at 692, 104 S.Ct. at 2067; *Cuyler v. Sullivan,* 446 U.S. 335, 350, 100 S.Ct. 1708, 64 L.Ed.2d 333 (1980). If appellant demonstrates this, then the second prong of the *Strickland* test will be met because prejudice is presumed. *Id.* Failure to make the required showing of a conflict of interest will defeat the ineffectiveness claim. *See, Strickland,* 466 U.S. at 700, 104 S.Ct. at 2071.

A review of the entire record before us leads to the conclusion that appellant was not denied effective assistance of counsel. Appellant's counsel represented appellant only. Defense counsel chose as his legitimate defense strategy to place the blame on another. The defense attorney attempted throughout the trial to implicate Johnny in the murder. He spent a large amount of his examination of Johnny pursuing a "Perry Mason"-like line of questioning in hopes that Johnny might confess to the crime. It is not unusual that the accused might strike back at the accuser. However, Johnny admitted that he misquoted defense counsel's statement to Amelia Sabedra; he further admitted that he was not present when defense counsel spoke with Jesse Sabedra. Counsel then used Johnny's lack of veracity to bolster his argument that it was Johnny and not appellant who truly committed the crime. Contrary to appellant's argument, we do not believe that Johnny's testimony caused defense counsel to be a potential witness in the case. We overrule appellant's ninth point of error, holding that appellant fails to prove defense counsel

had a conflict of interest rendering him ineffective.

In his nineteenth and twentieth points of error, appellant complains that the trial court erred by refusing to instruct the jury on the lesser-included offenses of aggravated sexual assault and burglary.[11] He argues that this violated his rights under the Fourteenth Amendment to the U.S. Constitution and that, under state law, he had a right to an instruction on every issue raised by the evidence that could have resulted in a conviction for a lesser-included offense.

In determining whether appellant is entitled to a charge on a lesser-included offense, we must consider all of the evidence introduced at trial, whether produced by the State or the defendant. *Goodwin v. State,* 799 S.W.2d 719, 740 (Tex.Cr. App.1990) cert. denied, 501 U.S. 1259, 111 S.Ct. 2913, 115 L.Ed.2d 1076 (1991); *Dowden v. State,* 758 S.W.2d 264, 269 (Tex.Cr.App. 1988). This Court uses a two-pronged test in its review. *Rousseau v. State,* 855 S.W.2d 666, 672 (Tex.Cr.App.), cert. denied, —— U.S. ——, 114 S.Ct. 313, 126 L.Ed.2d 260 (1993). First, the lesser-included offense must be included within the proof necessary to establish the offense charged. *Id.* at 673. Second, there must be some evidence in the record that would permit a jury rationally to find that if the defendant is guilty, he is guilty only of the lesser-included offense. *Id.; see also Hopper v. Evans,* 456 U.S. 605, 102 S.Ct. 2049, 72 L.Ed.2d 367 (1982). The credibility of the evidence and whether it conflicts with other evidence or is controverted may not be considered in determining whether an instruction on a lesser-included offense should be given. *Marras v. State,* 741 S.W.2d 395, 405 (Tex.Cr.App.1987).[12]

Without deciding whether appellant meets the first prong of the test,[13] we hold appellant fails to meet the second prong. The evidence adduced at trial shows that appellant had the deceased's blood on his

11. The jury was instructed on the lesser-included offense of murder.

12. Overruled on other grounds by *Garrett v. State,* 851 S.W.2d 853, 860 (Tex.Cr.App.1993).

13. Whether burglary and aggravated sexual assault are lesser-included offenses of capital murder needs to be decided on a case-by-case basis. *See Broussard v. State,* 642 S.W.2d 171, 173 (Tex.Cr.App.1982).

shirt and told family members that he had killed an old lady. In fact, appellant's statements indicate that if he was not guilty of capital murder, he was guilty of murder alone. No evidence was brought forward that appellant did not commit the murder. Despite appellant's assertions that his brother Johnny committed the murder, no evidence to support this allegation, physical or testimonial, can be found in the record other than questions and statements made by defense counsel. Appellant only raised evidence that his brother may have been present at the scene and may have ransacked the deceased's home.[14] There is no evidence in the record from which a rational trier of fact could conclude that appellant was guilty only of aggravated sexual assault or burglary. Appellant's nineteenth and twentieth points of error are overruled.

In his seventeenth point of error, appellant contends that the conduct of the prosecutor violated his rights under the Eighth and Fourteenth Amendments to the United States Constitution. He specifically complains that the prosecutor misstated the law, argued matters outside the record, and repeatedly attempted to inflame the jury during closing arguments.

 Appellant did not object at trial to any of the actions he complains of on appeal. He has failed to preserve error. Tex.R.App.P. 52(a); *Green v. State,* 682 S.W.2d 271, 294 (Tex.Cr.App.1984), cert. denied, 470 U.S. 1034, 105 S.Ct. 1407, 84 L.Ed.2d 794 (1985). Further, if error had been preserved, we conclude there was no error. Proper jury argument falls into four categories: (1) summation of the evidence; (2) reasonable deductions from the evidence; (3) response to defendant's argument; and (4) pleas for law enforcement. *McFarland,* 845 S.W.2d at 840. Appellant does not show that the prosecution argued outside of these categories. Appellant's seventeenth point of error is overruled.

### Punishment Phase

In points of error ten and eleven, appellant argues that the trial court erroneously allowed the prosecutor to elicit aggravating testimony about a tattoo of the word "Satan," placed on his wrist after the murder, and a picture appellant drew of Jesus Christ with horns. He claims this violated his "free exercise" rights under the First Amendment, his rights under the Eighth Amendment, and Article 37.071, V.A.C.C.P.[15] He further argues that the evidence had no relevance to the issue of future dangerousness. *See* Tex. R.Crim.Evid. 402. Neither the picture nor the tattoo were presented as evidence.

 During the punishment phase of a capital murder trial, evidence may be presented on any matter that the court deems relevant to answering the special issues. *Hernandez v. State,* 819 S.W.2d 806, 816 (Tex.Cr.App.1991), cert. denied, —— U.S. ——, 112 S.Ct. 2944, 119 L.Ed.2d 568 (1992). Evidence merely tending to affect the probability of the truth or falsity of a fact in issue is logically relevant. *Montgomery v. State,* 810 S.W.2d 372, 377 (Tex.Cr.App.1990). A capital defendant's expression of a constitutionally protected belief is relevant to future dangerousness if the belief is related to the murder itself. *See Dawson v. Delaware,* 503 U.S. 159, ——, 112 S.Ct. 1093, 1098, 117 L.Ed.2d 309 (1992); *Gholson v. State,* 542 S.W.2d 395, 397–98 (Tex.Cr.App.1976), cert. denied, 434 U.S. 882, 98 S.Ct. 247, 54 L.Ed.2d 166 (1977). Testimony regarding appellant's drawing and tattoo was relevant and admissible because the drawing and tattoo further evidenced that appellant believed Satan was telling him to kill. Earlier testimony revealed that appellant had told his sister that he had sold his soul to the devil, that the devil had told him to kill six people,

---

14. The only portions of the record that implicate Johnny in the murder are questions posed by defense counsel to witnesses. No witness stated that Johnny was involved nor did appellant produce any positive physical evidence linking Johnny to the murder.

15. At the time of trial, Article 37.071(a) stated in part that the article was "not to be construed to authorize the introduction of any evidence secured in violation of the Constitution of the United States or of the State of Texas." This provision is now codified in Article 37.0711, Section 3(a) for crimes occurring prior to September 1, 1991.

and that he had to kill four more. This made the testimony regarding the drawing and tattoo especially relevant to the second special issue because it showed that appellant might still believe that Satan had control over him and that he still had to kill four more people. Under the facts of this case, we conclude the trial court did not abuse its discretion in admitting the testimony. Points of error ten and eleven are overruled.

In points of error fourteen and fifteen, appellant asserts that the trial court erred by allowing the State to introduce evidence during cross-examination and argument that violated his right against self-incrimination. During the State's cross-examination, appellant objected only that the State was asking a question that had already been asked. He did not object on the grounds that the testimony violated his right against self-incrimination. Because his trial objection does not comport with the issue raised on appeal, he has preserved nothing for our review on this issue. *Johnson v. State,* 803 S.W.2d at 293, *overruled on other grounds; Heitman v. State,* 815 S.W.2d 681 (1991); *Thomas v. State,* 723 S.W.2d 696, 700 (Tex.Cr.App.1986). Further, appellant made no objections to the State's closing argument. He has failed to preserve error. Tex. R.App.P. 52(a); *Green,* 682 S.W.2d at 294. We overrule appellant's fourteenth and fifteenth points of error.

In appellant's sixteenth point of error, he argues that Article 37.071, which allows the introduction of unadjudicated extraneous offenses at the punishment phase, violates his rights to due process, equal protection, and a reliable sentencing process.

Appellant acknowledges that we have repeatedly held that unadjudicated offenses may be introduced during capital sentencing. *See, e.g., Harris v. State,* 827 S.W.2d 949, 962 (Tex.Cr.App.), cert. denied, —— U.S. ——, 113 S.Ct. 381, 121 L.Ed.2d 292 (1992); *Ramirez v. State,* 815 S.W.2d 636, 653 (Tex.Cr. App.1991). He raises no novel argument to persuade us to revisit these holdings. Point of error sixteen is overruled.

Point of error eighteen contends that the prosecutor argued for the death penalty in both phases of the trial on the basis of the victim's character and the impact of her death on others.[16] At the guilt/innocence phase, appellant made no objections to the State's argument. At punishment, appellant made no objections until after the jury recessed and had begun deliberations.

To preserve error committed during jury argument the defendant must make a timely objection. An objection that comes after the complained-of argument is concluded is untimely. *Borgen v. State,* 672 S.W.2d 456, 457 (Tex.Cr.App.1984). An exception to this rule exists when the jury argument is so prejudicial that an instruction to disregard the argument could not cure the harm. *Harris v. State,* 784 S.W.2d 5, 12 (Tex.Cr.App. 1989), cert. denied, 494 U.S. 1090, 110 S.Ct. 1837, 108 L.Ed.2d 966 (1990). This exception has been characterized as where "an argument is clearly calculated to inflame the minds of the jurors and is of such character as to suggest the impossibility of withdrawing the impression produced on the juror's minds (sic)." *Id.* at 12 n. 5.

Appellant clearly failed to make timely objections to the State's argument.

---

16. The complained of portions of argument are as follows:

Guilt/Innocence:

"Merle Laird was a good woman. She suffered a brutal, senseless, dehumanizing death. You only have to think about the bite marks on her left breast, the saliva on both breasts, the forcible penetration of her vagina, the semen on her pubic area and the fact that the penetration of her vagina occurred, according to the autopsy, when she was still alive. Yet, through this ordeal Merle Laird—Merle Laird struggled for life. You have seen the scratch marks in the pictures."

Punishment:

"Now, Ladies and Gentlemen, all of those that knew Merle Laird and loved her have waited all of this time for justice. The Sheriff's Department, the Texas Rangers have done all that they can do. In my limited way and with the assistance of Ken Bennett, we have done all that we can do to give justice.

\* \* \* \* \* \*

"No one but you on the face of this earth can give those that loved and cared for Merle Laird justice. You're the only people on the face of this earth who can give justice. I ask you to do justice, follow the evidence, render two yes answers."

Tex.R.App.P. 52(a). Further, we do not view the prosecutor's statements to be improper jury argument. *See McFarland,* 845 S.W.2d at 840; *Payne v. Tennessee,* 501 U.S. 808, 111 S.Ct. 2597, 115 L.Ed.2d 720 (1991). We conclude that the guilt/innocence argument was no more than a summation of the evidence. Any error that may have occurred could have been cured by a timely objection and instruction to disregard. The argument at punishment was proper because a capital sentencing jury is permitted to hear and consider evidence relating to the victim's personal characteristics and the emotional impact of the murder on the victim's family. *Payne,* 501 U.S. at 826, 111 S.Ct. at 2609. We overrule point of error eighteen.

█ In a similar unnumbered point of error, appellant contends that the prosecutor minimized the jury's sense of responsibility by arguing that they were not responsible for the imposition of the death penalty. The complained of portion of argument follows:

> "I would hasten to add to Mr. Sudderth's remarks by saying this. Don't let anyone put a guilt trip on you. You are not on trial. You had nothing to do with putting that man in the seat where he is now (indicating). You have found him to be guilty and don't let anyone put a guilt trip on you."

Appellant failed to object to the State's argument. Therefore, appellant has not preserved error for our review. *Green,* 682 S.W.2d at 294. Further, after reviewing the record, we do not view this argument as improper. The prosecutor's statements answer argument by opposing counsel. *See McFarland,* 845 S.W.2d at 840. The point of error is overruled.

In his twenty-first point of error, appellant complains that the special issues did not provide a vehicle for the jurors to consider his mitigating evidence. In point of error twenty-two, he argues the trial court erred by refusing to give an instruction that would have focused the jurors' attention on his mitigating evidence. *See Penry v. Lynaugh,* 492 U.S. 302, 109 S.Ct. 2934, 106 L.Ed.2d 256 (1989). We disagree.

█ When reviewing our sentencing scheme in reference to *Penry,* the crucial question is whether the defendant's evidence can be placed before the sentencer, and the sentencer has a reliable means of giving mitigating effect to the evidence. *Graham v. Collins,* 506 U.S. ——, ——, 113 S.Ct. 892, 901, 122 L.Ed.2d 260 (1993) (*Penry* "does not broadly suggest the invalidity of the special issues framework"). In *Penry,* the Supreme Court was presented with evidence of Penry's mental retardation, childhood abuse, and organic brain damage resulting in poor impulse control and an inability to learn from experience. The Supreme Court held that the special issues were unconstitutional *as applied* because the statute failed to provide the jury with a vehicle to give effect to the mitigating evidence. *Penry,* 492 U.S. at 323, 109 S.Ct. at 2949. The very nature of Penry's mitigating evidence answered the second issue in the affirmative.

Therefore, in considering appellant's points of error, we must determine: 1) what "mitigating evidence" was presented to the jury; 2) whether the two punishment issues provided a "vehicle" for the jury to give "effect" to such evidence, and, if not, 3) whether the trial court provided, in its charge to the jury on punishment, a "vehicle" for the jury to effectively consider the mitigating evidence. *Joiner v. State,* 825 S.W.2d 701, 706 (Tex.Cr. App.1992), cert. denied, —— U.S. ——, 113 S.Ct. 3044, 125 L.Ed.2d 729 (1993).

Appellant presents the following mitigating evidence:

1. his youth—appellant was only twenty-one or twenty-two years old at the time of the crime;

2. his severe intoxication; and

3. the State's decision not to prosecute his "more culpable" older brother.

We find that the special issues provided an adequate vehicle for the jurors to give effect to appellant's this evidence.

█ First, appellant's age may be effectively considered within special issue two and does not require an additional instruction. *Johnson v. Texas,* 509 U.S. ——,

——–——, 113 S.Ct. 2658, 2668–72, 125 L.Ed.2d 290 (1993)[17]; *Nelson v. State*, 848 S.W.2d 126, 136 (Tex.Cr.App.1992), cert. denied, —— U.S. ——, 114 S.Ct. 100, 126 L.Ed.2d 66 (1993). The fact that appellant was twenty-one or twenty-two at the time of the murder, although relevant to the concerns of special issue two, does not rise to the level of *Penry* evidence. Next, appellant's intoxication could be considered under the first special issue—whether his intoxication affected his conduct to the point that he may or may not have caused the decedent's death deliberately and with the reasonable expectation that death would result. *See Miniel v. State*, 831 S.W.2d 310, 321 (Tex.Cr.App.), cert. denied, —— U.S. ——, 113 S.Ct. 245, 121 L.Ed.2d 178 (1992). Further, no instruction was required on this matter. Appellant failed to present any evidence of temporary insanity caused by the intoxication. *See* V.T.C.A., Penal Code, Section 8.04(b). There is no need to include an instruction apprising the jury of such mitigating evidence and how to use it. *Id.* at 320. Third, the fact that appellant's brother may have been involved in influencing the instant offense may also be considered within the special issues. Additionally, we note that appellant did not present evidence that Johnny held any control or influence over appellant.[18] No further instructions were required. *See id.* Accordingly, we overrule appellant twenty-first and twenty-second points of error.

■■■■ Finally, in his twenty-third point of error, appellant alleges that the trial court erred in refusing to define the term "deliberately" in the charge. This Court has previously addressed this issue and held no definition is required. We decline to reconsider the issue. *See Johnson v. State*, 853 S.W.2d 527, 537 (Tex.Cr.App.1992), cert. denied, —— U.S. ——, 114 S.Ct. 154, 126 L.Ed.2d 115 (1993); *Harris*, 827 S.W.2d at 962.

The judgment and sentence of the trial court are affirmed.

MILLER and OVERSTREET, JJ., concur in the result.

BAIRD, Justice, concurring.

The majority resolves appellant's first point of error by stating: "... based upon the evidence before the trial court, the inferences the trial court could draw from the record are enough to support a finding that appellant appeared in a public place ... and that there was probable cause to arrest appellant for public intoxication." Majority Op. 52–3. I cannot agree that a yard of a private residence is a "public place" as contemplated by the Legislature when Tex.Penal Code Ann. § 42.08(a) was enacted.

### I.

At the hearing on appellant's motion to suppress evidence, appellant's sister, Amelia Sebedra, testified appellant came to her home during the early morning hours of August 3, 1986. Appellant requested Sebedra and her husband drive him to a cousin's home in Comanche and stated he had killed "an old lady and a guy who tried to defend her." During the drive to Comanche, appellant related that he had sold his soul to the Devil and the Devil instructed him to kill six people. Appellant stated he had to kill four more people. Appellant had a lot of money with him and offered Sebedra fifty dollars. Appellant's face and neck were scratched and his shirt had blood on it. After asking Sebedra to look at him, appellant stated he was Satan. Appellant's actions became so strange that Sebedra and her husband stopped their vehicle to calm appellant.

After leaving appellant at their cousin's home, Sebedra and her husband left to call appellant's parents. Sebedra then went to the Sheriff's office where she described appellant's behavior and statements to Comanche Police Officer McDonald and asked

---

17. The trial court in *Johnson,* as in the instant case, gave the jurors only the special issues and an instruction that they were to consider all the evidence from both phases of the trial in answering those issues. —— U.S. at ——, 113 S.Ct. at 2669.

18. Defense witness James Webb, a criminologist, testified that he would not be surprised if appellant was to some extent dominated by his older brother, but he had no knowledge of it.

McDonald to apprehend appellant. McDonald initially refused, stating the blood on appellant's shirt could be from a fight. However, at Sebedra's persistence, McDonald followed her to her cousin's home. As the police arrived appellant left through a back door, but was arrested when he returned.[1]

Appellant's cousin, Elvira Liendo, testified Sebedra and her husband brought appellant to her home in the early morning hours of August 3, 1986. Upon learning that Sebedra left, appellant became angry and stated he would kill her. Appellant further informed Liendo he had killed a lady in Hamilton. When Officer McDonald arrived at her home, appellant left through the back door. Liendo testified she gave McDonald appellant's bloody shirt. Finally, Liendo testified appellant was arrested when he returned to her home.

Officer McDonald testified he met with Sabedra and her husband during the early morning of August 3, 1986. Sabedra stated she and her husband had just driven appellant from Hamilton to a cousin's residence in Comanche. She informed him that appellant was drunk, belligerent and appeared to have blood on his shirt. Further, she related that appellant stated "he killed some people ... [and] had to get away from there [Hamilton]."

McDonald further testified he followed Sebedra to the Liendo's home. When McDonald arrived, several people came from the house stating "he's in the back yard." McDonald looked around the corner of the house and observed a man going over the fence. Giving chase, McDonald climbed the fence but did not see the man.

McDonald called for backup and returned to talk to appellant's relatives, who stated:

... [appellant] was drunk, acting crazy. He had talked about killing some people in Hamilton, said he was going to have to kill some more before he got away from Co-

manche, and they were—they stated they were scared of him.

McDonald testified that, during this conversation, Liendo gave him appellant's bloody shirt. When other policemen arrived, the search for appellant continued. Policemen checked the public streets, alleys and buildings in the immediate area but were unable to locate appellant. When McDonald drove back to the Liendo's residence he was informed appellant was again in the back yard. McDonald found appellant standing in the yard on the North side of the house. Appellant wore no shirt, was belligerent, and smelled strongly of alcohol. Observing the way appellant was "standing, swaying and swerving," McDonald determined appellant was intoxicated and arrested appellant for public intoxication. McDonald testified the only place he ever saw appellant was in the yard on the north side of Liendo's home.

## II.

Appellant's first point of error is based upon the trial judge's denial of his motion to suppress evidence obtained as a result of a warrantless arrest. Appellant contends the trial judge erred in denying appellant's motion to suppress the evidence obtained as a result of his warrantless arrest for public intoxication. As we stated in *Fry v. State*, 639 S.W.2d 463 (Tex.Cr.App.1982):

In Texas, a peace officer's authority to make a warrantless arrest is controlled exclusively by statute. The Code of Criminal Procedure authorizes very few exceptions to the general requirement that a peace officer obtain a warrant before making an arrest.

*Id.*, 639 S.W.2d at 465 (citations and footnotes omitted). Thus, the State held the burden of proving appellant's arrest fell within one of the statutory exceptions included Tex.Code Crim.Proc.Ann. art. 14. The State contends appellant's warrantless arrest was proper under either Tex.Code Crim.Proc. Ann. arts. 14.01(b) or 14.03(a)(1).

---

1. Sebedra's written statement was admitted at the hearing on appellant's motion to suppress.

In her statement, Sabedra states appellant left and hid in a tree when the police arrived.

### A.

I assume, from the extensive discussion of public intoxication in the majority opinion, the *majority finds appellant's warrantless arrest was proper* under art. 14.01(b). Majority Op., pp. 52–53. However, appellant's warrantless arrest cannot be justified by art. 14.01(b), which provides:

A peace officer may arrest an offender without a warrant for any offense *committed in his presence or within his view.*

*Id.* [2] Appellant did not violate Tex.Penal Code Ann. § 42.08(a), public intoxication, in McDonald's presence because McDonald never observed appellant *in a public place.* Tex.Penal Code Ann. § 42.08(a) provides:

(a) An individual commits an offense [Public Intoxication] if the individual *appears in a public place* under the influence of alcohol or any other substance, to the degree that the individual may endanger himself or another.

*Id.* (Emphasis added.) Tex.Penal Code Ann. § 1.07(a)(40) [3] defines "public place":

"Public place" means any place to which the public or a substantial group of the public has access and includes, but is not limited to, streets, highways, and the common areas of schools, hospitals, apartment houses, office buildings, transport facilities, and shops.

Under this definition, I cannot conclude appellant "appear[ed] in a public place." Liendo's home was a private residence and did not fit any of the illustrations provided by § 1.07(a)(40). Further, there is no evidence the public, or a substantial group of the public, had access to Liendo's yard.

In *Pugh v. State,* 55 Tex.Crim. 462, 117 S.W. 817 (Tex.Cr.App.1909), the defendant was convicted of "being drunk in a public place." *Id.* The State's evidence demonstrated Pugh attended a social gathering held at a private residence and was arrested when he was discovered "lying down in the yard apparently sick." *Id.* We held:

... A private residence cannot be a public place within the terms of our statute, nor at any time, unless it is made public by

being thrown open for access to the public.... Nor does the mere fact that a few invited guests attended the gathering of a friend at the private residence of their friend constitute that gathering a public one, or the residence a public place.... It may be questioned that the evidence is sufficient even to show that appellant was drunk; but clearly it excludes the idea that, if he was drunk, it was a public place.

*Id.,* 117 S.W. at 818. Therefore, under art. 1.07(a)(40) and our settled case law, the yard of a private residence is not a public place.

This failure of the State's proof prompts the majority to judicially create a "rule of inference" to satisfy the State's burden. Apparently, the majority believes the trial judge, and therefore this Court, may infer appellant was in a public place because: 1) appellant climbed a fence between two private residences; and, 2) law enforcement officers were unable to locate appellant by searching the public streets, alleys and buildings in the immediate area. Majority Op., pp. 51–53. Therefore, the majority concludes McDonald had probable cause to arrest appellant for public intoxication. Notwithstanding this newly created rule, art. 14.01(b) requires the offense to have been committed within the officer's view. Because McDonald never observed appellant in a public place, appellant's arrest was not justified under art. 14.01(b).

### B.

The State further contends appellant's arrest was lawful under art. 14.03(a)(1), which provides:

(a) Any peace officer may arrest, without warrant:

(1) persons found in suspicious places and under circumstances which reasonably show that such persons have been guilty of some felony or breach of the peace, or threaten, or are about to commit some offense against the laws....

However, the State fails to argue in their brief why this arrest was justified under art.

---

**2.** All emphasis is supplied unless otherwise indicated.

**3.** Formerly, Tex.Penal Code Ann. § 1.07(a)(29).

14.03(a)(1).[4] After reviewing the record, I do not believe appellant's arrest falls within the art. 14.03(a)(1) exception.

We have held that "circumstances which reasonably show that such person have been guilty of some felony ..." is the constitutional equivalent to probable cause to believe that a particular person has committed a felony. *Muniz v. State*, 851 S.W.2d 238, 251 (Tex.Cr.App.1992). Further, "few, if any, places are suspicious in and of themselves." *Id.* It is only when additional facts are available to policemen, along with reasonable inferences from those facts, which arouse suspicion, that a place may become a suspicious place. *Id. See, Lara v. State*, 469 S.W.2d 177, 179 (Tex.Cr.App.1971); *and, Muniz*, 851 S.W.2d at 251.

In the instant case, McDonald did not feel he had probable cause to arrest appellant for a felony. Such is evident in McDonald's explanation to Sebedra that he could not arrest appellant because appellant's dress and behavior was consistent with innocent activity. *See*, I, *supra. See also, Torres v. State*, 868 S.W.2d 798, 803 (Tex.Cr.App.1993). Further, Sebedra's report to McDonald did not establish probable cause to believe appellant had committed a felony. McDonald did not know Sebedra and could not vouch for her credibility. We have held information provided by a police broadcast or an anonymous phone call is insufficient, standing alone, to establish probable cause for an arrest. *See, Amores v. State*, 816 S.W.2d 407, 415 (Tex.Cr.App.1991); *Rojas v. State*, 797 S.W.2d 41, 43 (Tex.Cr.App.1990); *Glass v. State*, 681 S.W.2d 599 (Tex.Cr.App.1984); *Ferguson v. State*, 573 S.W.2d 516, 522 (Tex. Cr.App.1978); *Ablon v. State*, 537 S.W.2d 267, 269 (Tex.Cr.App.1976); *and, Mann v. State*, 525 S.W.2d 174, 176 (Tex.Cr.App.1975). A report by a citizen, whose credibility is unknown, is akin to an anonymous phone call and may not establish probable cause.

*Smith v. State*, 739 S.W.2d 848, 852 (Tex.Cr. App.1987). McDonald made no attempt to determine whether a murder had occurred in Hamilton or whether there was another explanation for appellant's reported behavior.

The instant case is similar to *Smith, supra*, where a police officer was dispatched to the Tip Top Club to investigate a fight. Upon his arrival the officer stopped to talk with three citizens outside the club. When the defendant came out of the club the citizens yelled "He has a gun." The officer gave Chase and arrested the defendant for public intoxication. *Smith*, 739 S.W.2d at 850–851. We held the arrest illegal:

> We have carefully examined ... the Code of Criminal Procedure ... but do not find there in where any of the listed statutory exceptions might be applied to this case. [Smith] was never shown to have been committing a felony, a misdemeanor, or an offense against the public peace in the presence or within the view of [the officer]. There is no evidence that might reflect or indicate that when [the officer] first saw him [Smith] was located in a suspicious place and under circumstances which might have reasonably shown that he was guilty of some felony or breach of the peace, or was threatening or was about to commit some criminal offense.

> \* \* \* \* \* \*

> Given the facts of this case, the information that [the officer] had when he first came into contact with [Smith] was, for purposes of establishing probable cause to arrest, no better than if the females had made an anonymous telephone call to him and told him that there had been a fight inside the club and that appellant had a gun.

*Id.*, 739 S.W.2d at 852. In the instant case, because the statements made by Sebedra

---

**4.** The State's total argument in relation to this issue is:

> ... Given the conversation that Officer McDonald had had with Appellant's sister and brother-in-law, Amelia and Jesse Sabedra; given the information that Elvira Liendo had furnished to him; given the bloody tee shirt that had been given to him by Elvira Liendo; and

> given the action of Appellant in crawling over the fence and running away when the officer arrived on the scene, Appellant was found by Officer McDonald in a suspicious place and under circumstances which reasonably showed that Appellant was guilty of some felony or breach of the peace, or threatened, or was about to commit some offense against the laws. State's Brief, pg. 19.

and Liendo were no more credible than an anonymous phone call reporting the same facts, McDonald had no basis upon which he could establish a reasonable belief that a felony or breach of the peace had been committed. Further, there is nothing suspicious about appellant's presence at his cousin's home or yard. Appellant's arrest was not authorized by art. 14.03(a)(1).

Therefore, appellant's warrantless arrest does not fall within any of the exceptions to our general requirement that a peace office must have a warrant before making an arrest.

### III.

Having found appellant's arrest to be illegal, the next inquiry is whether the trial judge erred in overruling appellant's motion to suppress. Appellant's motion does not state what evidence should be suppressed as a result of his illegal arrest. However, appellant contends, on appeal, the trial judge should have suppressed appellant's statements to a Comanche County jailer and certain physical evidence obtained while he was in custody.

### A.

### Appellant's Statement

After appellant's arrest, McDonald transported appellant to the Comanche County Jail and informed appellant of his rights under *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). Beth White was the jailer assigned to book the prisoners. Unaware of appellant's earlier statements to Sebedra and Liendo, or the incidents which occurred at Liendo's home, White proceeded to book appellant into the jail. When White attempted to place appellant in the "drunk tank" he stated: "Don't put me in with anybody else. I'll kill them. I have already—it won't bother me to kill them, I have already killed somebody." Appellant then explained he had stabbed someone to death in Hamilton. White moved appellant to an individual cell and recorded his statements in the jail log.

Evidence will not be excluded simply because it is obtained after an illegal arrest.

*Bell v. State*, 724 S.W.2d 780, 787 (Tex.Cr. App.1986). To determine whether the trial judge correctly denied appellant's motion to suppress appellant's statements to White, we must review the circumstances surrounding the statements to determine whether they are sufficiently attenuated from the taint of the illegal arrest. *Id.; Maixner v. State*, 753 S.W.2d 151, 155 (Tex.Cr.App.1988); *and, Johnson v. State*, 871 S.W.2d 744, 751 (Tex. Cr.App.1994). In *Brown v. Illinois*, 422 U.S. 590, 95 S.Ct. 2254, 45 L.Ed.2d 416 (1975), the Supreme Court provided four relevant factors to assist in our determination:

(1) whether or not the accused received *Miranda* warnings;

(2) the temporal proximity of the arrest and the [statements]

(3) the presence of intervening circumstances; and

(4) the purpose and flagrancy of the official conduct.

*Brown*, 422 U.S. at 604–605, 95 S.Ct. at 2261–2262.

In the instant case appellant received his *Miranda* warnings prior to his statements. However, the statements occurred shortly after appellant's arrest and there were no intervening circumstances. Therefore, while the first factor militates in favor of the admissibility of appellant's statements, the second and third factors militate against the admission of appellant's statements. But I believe the fourth factor is determinative in the instant case. There is nothing in the record to suggest McDonald had any underlying purpose in arresting appellant or that the illegal arrest was particularly flagrant. Appellant's statements did not result from custodial interrogation. Instead, the statements were made to a jailer who was unaware of the circumstances of appellant's arrest or of appellant's statements to Sebedra and Liendo. Indeed, White was following established procedure at the Comanche County Jail attempting to place an intoxicated prisoner into the "drunk tank." White had no reason to suspect appellant of any other offense and was not investigating any offense. Therefore, appellant's statements are sufficiently attenuated from his illegal

arrest because appellant received his *Miranda* warnings and there is a complete absence of any improper purpose or flagrant police misconduct. The trial judge did not err in overruling appellant's motion to suppress his statements to White.

### B.

### The Physical Evidence

The record indicates that on the day of appellant's arrest, a Hamilton County Justice of the Peace issued a warrant for appellant's arrest on capital murder charges. The warrant was served on appellant in the Comanche County Jail and appellant was taken before a Comanche County Justice of the Peace and informed of his legal rights.[5] The Justice of the Peace executed a form entitled "Warning of Rights" indicating appellant was informed of these rights and appellant executed the same form indicating he understood them. Appellant was thereafter transported to, and booked into, the Hamilton County Jail. After arriving at the Hamilton County Jail, appellant agreed to provide samples of his head and pubic hair. The next day appellant was again informed of his legal rights by a Hamilton County Justice of the Peace. Subsequent to this second warning, appellant consented to the production of samples of his blood and saliva, and later provided additional samples of his head and pubic hair.

The physical evidence was seized after the Hamilton County Justice of the Peace issued a capital murder arrest warrant. In *Cook v. State*, 858 S.W.2d 467 (Tex.Cr.App.1993), the defendant challenged the legality of his arrest and contended the trial judge erred by failing to suppress the victim's watch and wallet which were found on the defendant. However, a warrant for Cook's arrest was issued prior to the seizure of the evidence. We stated:

> [Cook] does *not* contest the validity of the warrant. Therefore, the record does

not support [Cook's] contention that the seizure of the watch and the wallet were the result of an illegal search and arrest.

*Id.*, 858 S.W.2d at 473. Our reasoning in *Cook* is applicable to the instant case. The physical evidence was not seized until after the arrest warrant from Hamilton County was executed and appellant does not contest the validity of that warrant. Therefore, the trial judge did not err in overruling appellant's motion to suppress the physical evidence.

### IV.

Appellant's warrantless arrest did not meet the requirements of Tex.Penal Code Ann. § 14.01(b) or § 14.03(a)(1), and was, therefore, illegal. However, the trial judge correctly overruled appellant's motion to suppress. Therefore, I concur in the majority's resolution of appellant's first point of error and join only the judgment of the Court.

CLINTON, J., joins this opinion.

---

5. Appellant was informed: 1) he was charged in Hamilton County with capital murder; 2) he had the right to retain a lawyer to represent him prior to any questioning, or, if he was to poor to retain a lawyer, he could request the appointment of a lawyer; 3) he had the right to remain silent; 4) he did not have to make any statement and any statement that he made may be used against him; 5) he had the right to stop any interview at any time; 6) he had the right to an examining trial; and 7) that bail was denied. *See,* Tex.Code Crim.Proc.Ann. art. 15.17.