

# IN THE COURT OF CRIMINAL APPEALS
# OF TEXAS

## NO. AP-75,352

**CHRISTOPHER ANTHONY YOUNG, Appellant**

**v.**

**THE STATE OF TEXAS**

**ON DIRECT APPEAL**
**FROM CAUSE NO. 2005-CR-1183 IN THE 187TH DISTRICT COURT**
**BEXAR COUNTY**

**PER CURIAM. COCHRAN, J.,** filed a concurring opinion. **PRICE, J.,** filed a dissenting opinion. **KEASLER, J.,** concurred in the result with respect to point of error fifteen and otherwise joined the opinion. **HERVEY, J.,** did not participate.

## O P I N I O N

The appellant was convicted in February 2006 of capital murder.[1]  Based upon the

jury's answers to the special issues set forth in Texas Code of Criminal Procedure article

---

[1]

TEX. PENAL CODE §19.03(a).

37.071 §§2(b) and 2(e), the trial judge sentenced the appellant to death.[2] Direct appeal to this Court is automatic.[3]   After reviewing the appellant's fifteen points of error, we find them to be without merit.  Consequently, we affirm the trial court's judgment and sentence of death.

The appellant challenges the sufficiency of the evidence at both phases of trial.  We shall address these issues first.  The remaining points of error will be addressed in the order presented in the briefs.

In points of error one and two, the appellant contends that the evidence is both legally and factually insufficient to prove that he committed capital murder.  He argues that the State's primary evidence, the store surveillance video, is not enough, legally or factually, to convict him of murdering the victim "while in the course of committing or attempting to commit the offense of robbery."[4]  Specifically, the appellant asserts that: (1) the tape's video sequence does not include conduct by the appellant that would imply that he was robbing or attempting to commit a robbery at the victim's store; and (2) the tape's sound in the corresponding audio is so "muddled" that it would be almost impossible for the jury to decipher any recorded dialogue that indicates that the appellant was in the course of committing robbery or attempting to commit robbery at the victim's store. The appellant also

---

[2] TEX. CODE CRIM. PROC. art. 37.071 §2(g).  Unless otherwise indicated all future references to Articles refer to the Texas Code of Criminal Procedure.

[3] Art. 37.071 §2(h).

[4] TEX. PENAL CODE §19.03(a)(2).

claims that the eyewitness testimonies of convenience store patrons, Raul Vasquez, Jr. and Hattie Helton, contributed little, if any, evidence to prove that the murder occurred in the course of a robbery.

The evidence at trial established that on November 21, 2004, within minutes of stealing a red Mazda Protégé from its owner at gunpoint, the appellant drove the stolen vehicle to the mini-mart/dry cleaners owned by Hasmukhbhai Patel. The following events were captured on the store's surveillance camera:[5] the appellant, wearing a black shirt and light-colored shorts, entered the store at 9:37 a.m. and appeared to be holding something hidden within his left pocket. The appellant looked around the front of the store before moving behind Patel, who was working in the rear of the store. The appellant asked Patel the cost of cleaning clothes at the store. The appellant's voice immediately changed to a lower tone, and the appellant stated, "Alright [sic], give up the money. I'm not playing. I'm not fucking playing." Patel came into view as he quickly moved behind the counter towards the cash register, and the appellant could be seen leaning over the front counter with his left arm completely extended, pointing a silver handgun at Patel. Again, the appellant ordered Patel to "give up the money," followed by the appellant's firing his first shot in the direction of Patel (now out of view behind the cash register). The appellant then yelled, "You be fucking up. I'm not playing. Give it up!" He fired a second shot in the direction of Patel.

---

[5] The surveillance camera provided both audio and video evidence of the crime. The camera also time and date-stamped the film so it evidences the exact timing of the offense.

At this point, the alarm went off as Patel had apparently pushed the panic button on the system. The appellant, with his handgun still extended, followed the fleeing Patel to the opposite side of the front counter, and he could be heard over the alarm shouting, "I said give up the money, right." The video caught the appellant's movement behind the counter in the direction of the cash register. He was out of view for a few seconds before coming back into view and was then seen concealing his handgun under his shirt as he left the store.

Two of Patel's regular customers, Raul Vasquez, Jr. and Hattie Helton, happened to be in the parking lot of the store at the time of the offense. Vasquez had just pulled into a parking space in front of the store. Before he could exit his truck, he heard gunshots and looked up to see a black male leaning over the counter firing a gun at Patel. When the gunman left the store and got into a small red car, Vasquez called the police and then chased the gunman, but with no success. Vasquez was able to tell the police that the car's license plate had a "W" and that the perpetrator was wearing a black shirt and light-colored shorts. Helton, who was parked directly in front of the door, had just exited the store moments earlier and was in her car checking her "scratch-off" lottery tickets. When she heard the store alarm go off, she looked up to see a black male exit the store and get in a small red car that was parked by the gas pumps. Once he was gone, Helton exited her car and called to Patel. When he did not answer, Helton called the police on a payphone located outside of the store. Both Vasquez and Helton identified the appellant as the perpetrator at trial.

The appellant was apprehended at approximately 11:00 a.m. when an officer spotted

the red car parked at a house several miles away. The car's license plate began with a "W." The appellant was wearing a black shirt and light-colored shorts. The appellant's hands, shirt, and the steering wheel of the car all tested positive for gunshot residue. Patel's blood was found on one of the appellant's socks. Patel died from the gunshot wound to his chest. The murder weapon was never recovered.

In reviewing a claim that evidence is legally insufficient to support a judgment, "the relevant question [on appeal] is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt."[6] This standard accounts for the factfinder's duty "to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts."[7] Therefore, in analyzing the legal sufficiency, we will determine whether the necessary inferences are reasonable based upon the combined and cumulative force of all the evidence, both direct and circumstantial, when viewed in the light most favorable to the verdict.[8]

In a factual-sufficiency review, the evidence is reviewed in a neutral light rather than

---

[6] *Jackson v. Virginia*, 443 U.S. 307, 319 (1979).

[7] *Id*.

[8] *Clayton v. State*, 235 S.W.3d 772, 778 (Tex. Crim. App. 2007).

in the light most favorable to the verdict.[9] Evidence can be factually insufficient in one of two ways: (1) when the evidence supporting the verdict is so weak that the verdict seems clearly wrong and manifestly unjust, and (2) when the supporting evidence is outweighed by the great weight and preponderance of the contrary evidence so as to render the verdict clearly wrong and manifestly unjust.[10] Although an appellate court's factual-sufficiency review of the evidence allows the court to second-guess the jury to a limited degree, the review should still be deferential to the jury's verdict.[11]

Capital murder occurs when a person intentionally commits murder while in the course of committing or *attempting to commit* robbery.[12] The State did not bear the burden of proving that the appellant completed the theft of the victim in order to establish the underlying offense of robbery or attempted robbery.[13] Rather, the requisite intent to rob may be inferred from circumstantial evidence, particularly the appellant's assaultive conduct.[14]

---

[9]

*Roberts v. State*, 220 S.W.3d 521, 524 (Tex. Crim. App.), *cert. denied*, 128 S. Ct. 282 (2007).

[10]

*Watson v. State*, 204 S.W.3d 404, 414-15 (Tex. Crim. App. 2006).

[11]

*Roberts*, 220 S.W.3d at 524; *Cain v. State*, 958 S.W.2d 404, 407, 410 (Tex. Crim. App. 1997).

[12]

*See* TEX. PENAL CODE § 19.03(a)(2)(emphasis added).

[13]

*See Bustamante v. State*, 106 S.W.3d 738, 740 (Tex. Crim. App. 2003).

[14]

*See id.* at 740-41; *Alvarado v. State*, 912 S.W.2d 199, 207 (Tex. Crim. App. 1995).

In this case, there was ample evidence, circumstantial and direct, of assaultive conduct characteristic of attempted robbery displayed by the appellant in the store surveillance tape.[15]

Despite the video sequence being short, and the events occurring quite fast, there is sufficient evidence on the surveillance tape that a jury could reasonably infer that the appellant murdered Patel in the course of an attempted robbery.  Assaultive conduct, the gravamen of robbery, is demonstrated in the video by the appellant holding Patel at gunpoint after demanding the surrender of his money, forcing him behind the counter, and firing shots at Patel in response to his apparent refusal to give up the money.  Vasquez's testimony that he saw a black man leaning over the front counter shooting at Patel is further evidence of assaultive conduct typical of a robbery.

The appellant insists the tape is devoid of "many of the hallmarks of robbery."  To the contrary, the tape clearly evidences the appellant making several statements demonstrative of robbery, such as:  "Alright [sic], give up the money. I'm not playing. I'm not fucking playing," and in the midst of firing shots at Patel shouting, "You be fucking up. I'm not playing. Give it up!" and, "I said give up the money, right."  The appellant attacks the clarity of the dialogue between himself and Patel, most notably by his reference to State's witness Detective Sean Walsh's admission that he was unable to understand what was being said on the videotape.  However, the jury had the opportunity to listen to the audio numerous times: during the presentation of evidence, during the State's closing arguments, and during

---

[15]

See Green v. State, 840 S.W.2d 394, 401 (Tex. Crim. App. 1992).

its deliberations.[16]    The jury could reasonably infer that the appellant intentionally committed murder in the course of committing or attempting to commit robbery based upon the combined and cumulative force of all the evidence.[17]  Because we view the evidence in the light most favorable to the verdict, and we find that a rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt, we hold that the evidence was legally sufficient to support the jury's guilty verdict in this case.[18]  Even in considering all the evidence in a neutral light, we find that the evidence was not so weak nor so outweighed by the great weight of contrary evidence as to make the verdict seem clearly wrong and manifestly unjust.[19]  Thus, the evidence was factually sufficient to support the verdict.  The appellant's first and second points of error are overruled.

In point of error eleven, the appellant challenges the sufficiency of the evidence regarding future dangerousness.[20]    In reviewing the sufficiency of the evidence at the punishment phase, we view the evidence in the light most favorable to the verdict and

---

[16]

We note that we have reviewed the surveillance video and were able to hear and understand the appellant's statements.

[17]

S*ee  Clayton*, 235 S.W.3d at 778.

[18]

*See Jackson*, 443 U.S. at 319.

[19]

*Roberts*, 220 S.W.3d at 524; *Watson*, 204 S.W.3d at 317.

[20]

*See* Art. 37.071 §2(b)(1).

determine whether any rational trier of fact could make the finding beyond a reasonable doubt.[21] A jury is permitted to consider a variety of factors when determining whether a defendant will pose a continuing threat to society.[22]

In its determination of the special issues, the jury is entitled to consider all the evidence presented at the guilt phase of the trial, in addition to the evidence presented at the punishment phase.[23] The circumstances of the offense and the events surrounding it may be sufficient in some instances to sustain a "yes" answer to the future-dangerousness special issue.[24]

The evidence in the instant case revealed that, immediately after he stole a car from a woman at gunpoint, the appellant drove to Patel's store, demanded money, and then shot Patel dead when Patel did not cooperate quickly enough. The appellant then left the store,

---

[21]

*Banda v. State*, 890 S.W.2d 42, 50 (Tex. Crim. App. 1994).

[22]

*See Keeton v. State*, 724 S.W.2d 58, 61 (Tex. Crim. App. 1987). Among those factors are: (1) the circumstances of the capital offense, including the defendant's state of mind and whether he was working alone or with other parties; (2) the calculated nature of the defendant's acts; (3) the forethought and deliberateness exhibited by the crime's execution; (4) the existence of a prior criminal record, and the severity of the prior crimes; (5) the defendant's age and personal circumstances at the time of the offense; (6) whether the defendant was acting under duress or the domination of another at the time of the offense; (7) psychiatric evidence; and (8) character evidence. *Id.*

[23]

*Banda*, 890 S.W.2d at 51; *Valdez v. State*, 776 S.W.2d 162, 166-67 (Tex. Crim. App. 1989).

[24]

*Banda,* 890 S.W.2d at 51*; see also Hayes v. State,* 85 S.W.3d 809, 814 (Tex. Crim. App. 2002).

disposed of his weapon, and picked up a prostitute with whom he could do drugs. This evidence of such a callous crime might alone support a finding of future dangerousness. However, the State presented further evidence that, immediately prior to the instant crime, the appellant also committed aggravated sexual assault on the woman from whom he stole the red Mazda Protégé.

At approximately 8:45 a.m. on November 21, 2004, Daphne Edwards was serving breakfast to her three young girls, all under the age of eight, when she realized that she was out of cigarettes. Edwards decided to leave her efficiency apartment and quickly drove to Patel's store about one block away while the children were eating. She was gone less than five minutes. Upon returning, she parked in front of the apartment and went straight inside. Almost immediately after her return, there was a knock on her door. Thinking it was her sister, Edwards opened the door to find the appellant standing there pointing a silver revolver at her. The appellant put the gun to Edwards' head, pushed his way in and asked her, "Where's the fucking money?" The appellant walked Edwards through the apartment at gunpoint to make sure no one else was home other than the children and that there was no access to a phone. The three children were scared and crying. Edwards gave the appellant all the money that she had in her purse – $28 – but he told her that she had to give him something else because that was not enough money. The appellant then told Edwards to undress. He had Edwards tell her girls to go to the other room; however, as it was an efficiency apartment the girls could still see and hear everything that happened. The

appellant then told Edwards that she was not disrobing quickly enough, so he shot the gun into the floor next to her feet.  Edwards disrobed, and the appellant made her sit in a chair and perform oral sex on him.  The appellant then made Edwards walk to the bathroom where the children could not fully see what was happening but the appellant could see the children. The appellant then made Edwards get on her knees and perform oral sex on him again.[25]  The appellant then decided that he wanted Edwards to wear something "sexy" for him, so he took her back out of the bathroom to get her clothes.  Edwards picked out an outfit but the appellant thought it was too long, so she picked out another outfit.  He made her put on this outfit but did not allow her to put on any underwear.  The appellant then decided that he wanted to leave.  When Edwards protested that she would not leave her children, the appellant told her, "You did it before.  I saw you."  The appellant then walked over to the children and kissed each of them on the cheek and told them that their mommy would be back.

The appellant then forced Edwards, still at gunpoint, to leave the apartment and get into her red Mazda Protégé.  He had her drive to the front of the apartment complex, at which point he decided that he wanted to drive.  As he was getting out of the car, he told Edwards not to drive off or he would go back and kill her children.  He told her to move to the passenger seat.  As he was getting into the driver's seat, Edwards took the opportunity to escape – the appellant had left the passenger door open and Edwards saw some people in the

---

[25] DNA tests confirmed the sexual assault by the appellant.

parking lot. She ran screaming to her cousin's apartment at the front of the complex where they called the police and then went to get the children. The appellant drove off in Edwards' car.

In addition to this evidence, the State also presented the appellant's previous convictions for possession of marijuana, evading arrest, and three assaults with bodily injury, two involving injury to his mother when he was a juvenile. The third assault occurred in September 2004 and involved his girlfriend, Chala Riley, who was eight-months pregnant at the time. In order to stop the assault, Riley lied and told the appellant that she was going into labor. Further, the night before the instant offense, the appellant accosted the same girlfriend after she informed him that she was permanently breaking off their relationship. The appellant pulled her out of her car, beat her, and then took her car, purse, and cell phone. Other evidence showed that the appellant shot at another person in a parking lot on May 9, 2004, but charges were never filed.

Appellant presented evidence of a tumultuous childhood. When he was eight years old, his father was murdered and his sister was molested and impregnated by his stepfather. Appellant argued that he never recovered from these events emotionally as he never received the counseling or the father figures that he needed. He became angry and withdrawn and began using drugs. However, the appellant's mother, new stepfather, aunt, and grandmother all testified to the appellant's good side and how they were all shocked and surprised by the instant offense. The appellant had just had two children, a daughter born in June and another

in September, and he was attempting to get custody of one of the girls prior to the offense. The appellant also presented evidence that he had told a psychologist that he had consumed fifteen to twenty beers and smoked marijuana the night before the instant offense, and that he smoked crack cocaine the morning of the offense. The appellant further pointed out that he committed no acts of violence or even infractions during his fourteen months of incarceration while waiting for his trial. The appellant argues that this evidence should outweigh the evidence presented by the State. While intoxication at the time of the offense and good behavior in prison are factors that a jury might consider, neither precludes a finding of future dangerousness.[26] We have held that, while this Court can review the objective evidence of future dangerousness, we do not engage in reviewing the jury's normative decision on mitigation, whether it answers in the affirmative or the negative.[27] Therefore, we defer to the jury's conclusion that the evidence was not sufficient to warrant a sentence of life imprisonment and conclude there was sufficient evidence to support the jury's affirmative finding on the future dangerousness issue. Point of error eleven is overruled.

In his third point of error, the appellant claims that the trial court erred in overruling his *Batson*[28] challenges regarding three African-American venire members: Geneva Johnson,

---

[26] *See Banda*, 890 S.W.2d at 50-51 (intoxication); *Emery v. State*, 881 S.W.2d 702, 707 (Tex. Crim. App. 1994) (lack of violent behavior in prison).

[27] *Colella v. State*, 915 S.W.2d 834, 845 (Tex. Crim. App. 1995).

[28] *Batson v. Kentucky*, 476 U.S. 79 (1986).

Myrtlene Williams, and Paulette Childress.[29]  After the appellant objected to the State's

peremptory challenge of each of these venire members as racially motivated, the trial court

held a *Batson* hearing in which the prosecutors testified as to their race-neutral reasons for

exercising the peremptory strikes.  The trial court found the State did not exercise the

peremptory strikes on the basis of race and overruled each of the appellant's challenges.

In *Batson*, the Supreme Court outlined an analytical tool for testing the challenges to

the State's use of peremptory strikes.  Initially, the defendant must establish a *prima facie*

case showing that the State exercised its peremptory challenges in a discriminatory manner.

 The burden then shifts to the State to articulate race-neutral explanations for its questioned

strikes which the defendant may rebut.  Finally, the trial court must determine whether the

defendant has carried his burden of proving purposeful discrimination by the State.[30]

In the instant case, we need not address whether the the appellant established a *prima*

*facie* case.  Where the prosecutor has articulated his reasons for the challenged peremptory

strike and the trial court has ruled on the ultimate questions of intentional discrimination, that

issue becomes moot.[31]  Therefore, we shall go on to review the trial court's decisions.

We review the record of a *Batson* hearing and the voir dire examination in the light

---

[29]

  *See* Art. 35.261.

[30]

  *See Batson v. Kentucky*, 479 U.S. at 106.

[31]

  *Cantu v. State*, 842 S.W.2d 667, 689 (Tex. Crim. App. 1992); *Hernandez v. New York*, 500 U.S. 352 (1991).

most favorable to the trial court's ruling.[32]  We will not disturb a trial court's ruling on a *Batson* issue unless it is clearly erroneous.[33]

We first note that, in the instant case, six out of sixty venire members were African-American.[34]  Of these six venire members, one was disqualified, one was challenged for cause by the State without objection by the defense, and three were excluded by the State's peremptory strikes.  One African-American was accepted to serve on the jury and was the second juror selected overall.   The State exercised a total of fourteen peremptory strikes.

Juror number 27, Geneva Johnson, was the first African-American prospective juror struck by the State.  Following the defense's *Batson* challenge, the State gave the following race-neutral basis for exercising the strike:

> [State]:  Your Honor, in response, the prospective juror indicated on her questionnaire that the defendant appeared to be about the age of her sons, that she was not sure she could render a fair verdict. And while she believed in capital punishment, she did not think she could make that decision herself.  It is based on that comment and that comment in her questionnaire alone that –

---

[32]

*Gibson v. State*, 144 S.W.3d 530, 534 (Tex. Crim. App. 2004); *Cantu*, 842 S.W.2d at 689; *Harris v. State*, 827 S.W.2d 949, 955 (Tex. Crim. App. 1992).

[33]

*Gibson*, 144 S.W.3d at 534; *Cantu*, 842 S.W.2d at 689; *Whitsey v. State*, 796 S.W.2d 707, 726 (Tex. Crim. App. 1990) (op. on reh'g).

[34]

Approximately 200 prospective jurors were called.  However, the jury was seated after the initial sixty were questioned or otherwise disqualified.

[COURT]: Her response to question 89.[35]

[State]: That is correct. And that was the reason for the State's peremptory challenge in this case.

[COURT]: Go ahead. [To Defense]

[Defense]: Judge, I think also that we should be given the opportunity to question her further if they're going to base it solely on the questionnaire. That they had a chance to ask her to clarify that. They did. And I don't think that her response bears out what was stated in the questionnaire. The point of the questionnaire is simply to provide a road map for questioning at the time of the actual live voir dire. And she was asked to explain that. I think she gave a sufficient answer such that she's not–challenge her peremptorily on that basis.

[COURT]: It's denied.

The appellant argues the State's reasons for striking Johnson were not race-neutral. Specifically, he contends that the State displayed disparate treatment towards similarly situated non-African American venire members through a comparison of Johnson's responses to those of two Hispanic venire members, Jason Olivarri and Jaime Pena. The State accepted Olivarri as a member of the jury without any objection by the defense, while Pena was peremptorily struck by the defense. The appellant claims that the State's stated

---

[35]
    Question 89 of the Bexar County Juror Information questionnaire asked, "Do you know of a reason why you could not serve as a juror in this case and be absolutely fair to both the Defendant and the State, and render a verdict based solely upon the evidence presented to you?" Immediately following the question there was space to check "Yes" or "No", and following the question, "If yes, please explain." Two lines were provided for the prospective juror to answer the question.

basis for striking Johnson was its concern regarding her ability to render a fair verdict, and if the State's reason was indeed race-neutral, then the State would have also struck Olivarri and Pena, whose responses should have elicited the same type of concern.

Johnson stated in Question 89 of her jury questionnaire that she was unsure whether she could render a fair verdict because the defendant reminded her of her own sons.[36] Olivarri's response also indicated that he had a reason that might cause him to not be fair, stating "I get easily nervous and could easily sway in favor of either party if they pressured me hard enough." The appellant's attempt to characterize these responses as being similar is misplaced. Johnson's statement in Question 89 regarding her uncertainty in her ability to render a fair verdict was in reference to her personal belief that she might not be able to vote in favor of the death penalty because it would be like convicting her own sons. Olivarri implied that he just might be easily swayed by jury argument. Further, regarding the death penalty, Johnson indicated she might be unable to assess the full range of punishment for the crime in which the defendant was charged. In comparison, Olivarri told the prosecutor that he believed in an "eye for an eye," and would be in favor of the death penalty if he found the evidence supported such a verdict. Hence, the concerns raised by Johnson's and Olivarri's responses in their questionnaires and during voir dire are sufficiently dissimilar so as to

---

[36] In her juror questionnaire, Johnson explained her affirmative answer to Question 89 by stating "The defendant appears to be about the age of my sons. I'm not sure I would render a fair verdict. While I believe in capital punishment[,] I don't think I could make that decision myself." She elaborated on those answers during voir dire.[22]

dispel any inference of disparate treatment by the State.

The appellant also compares the State's concerns regarding Johnson's inability to render a fair verdict to Jaime Pena's possible prejudices against the State as a result of his prior false arrest. The State argues it was more likely the defense would find Pena to be a greater risk based on Pena's business connections to the victim's family. The State did not need to waste a peremptory strike on Pena knowing the defense would exercise one. Thus, the appellant's argument that the State displayed disparate treatment of venire member Pena as compared with Johnson is not borne out by the record.

Juror number 38, Myrtlene Williams, was the second African-American prospective juror struck by the State. In response to the defense's *Batson* challenge, the State offered the following explanation for striking Williams:

> [State]: Our position, Judge, is she participates in what's called the Outreach Ministries, and the group that she participates with goes into the prison for the sole purpose of rehabilitating people within the jail and the prison system. And that's our main reason. And then in addition that, she has a daughter who has, that she had mentioned, been convicted of a larceny type offense in the State of North Carolina.
>
> * * *
>
> [Defense]: Mr. Bunk, is there, in any response from Ms. Williams, to you, that indicate that she cannot be fair or impartial and listen to the evidence presented in this case?
>
> [State]: I didn't ask her that question, sir.
>
> [Defense]: Exactly. Is there, in any response from Ms. Williams, that she would not fairly or impartially answer the special issue questions

> concerning life or death?

[State]:      No. I chose to strike her because of her membership with Outreach Ministry, and her daughter's—specifically her daughter's criminal history.

Discriminatory intent is not inherently present in the State's proffered race-neutral explanation.[37] In his attempt to rebut the State's reasons for striking Williams, the appellant merely asserts other areas in which the State may have inquired, such as the juror's ability to consider the full range of punishment, the same inquiry that the State based its strike of prospective juror Johnson. However, the State did not have to further examine Williams regarding her opinion of the death penalty if it had already decided that the juror's membership in the Outreach Ministries, in addition to her daughter's criminal history, would make her undesirable as a member of the jury. Nevertheless, the appellant now argues on appeal that the State's race-neutral reasons were pretextual because the State misconstrued Williams' role in the Outreach Ministries and displayed disparate treatment with regard to other non-African American jury members who also had personal criminal histories or close relatives with criminal histories.

The appellant argues that the prosecutor, in an effort to keep an African-American off the jury, mischaracterized Williams' words to make it seem as though Williams personally ministered to inmates for the sole purpose of rehabilitating them. Williams advised the prosecutor during her voir dire examination that she was a member of Outreach Ministries.

---

[37] *See Purkett v. Elem*, 514 U.S. 765, 768 (1995)(*per curiam*).

However, she stated that her involvement in the group was focused on helping the homeless and families in poverty in an effort to "bring them closer to the Church." When Williams told the prosecutor that there were members of her group that attended the jails and prisons, the prosecutor asked Williams what the purpose of such visits was, to which she agreed that the purpose was to attempt to rehabilitate inmates.

An examination of the exchange makes it apparent that the State did not intentionally misconstrue Williams' words in its explanation of its strike. The State's main basis for excluding Williams from the jury – that "*the group* that she participates with goes into the prison for the sole purpose of rehabilitating people" – is consistent with Williams' voir dire account of *those particular members'* goal in its ministry. It was not improper for the State to strike Williams based on her connection to Outreach Ministries if it felt her membership could cause her to be more sympathetic to the defendant, particularly in the punishment phase of trial.[38] Furthermore, whether the prosecutor was accurate in his assertion that it was the Outreach Ministry members' *sole* purpose in going to the prison to rehabilitate the prisoners, is inconsequential. The trial court is not required to find a *Batson* violation simply because the proffered explanation turns out to be incorrect.[39] Hence, the appellant's contention of

---

[38]

*See Casarez v. State*, 913 S.W.2d 468, 496 (Tex. Crim. App. 1995) (stating that "in the case of religion, the attribution is not overly broad, and therefore not invidious, when the belief is an article of faith[; b]ecause all members of the group share the same faith by definition, it is not unjust to attribute beliefs characteristic of the faith to all of them").

[39]

*Gibson*, 144 S.W.3d at 534 n.5 (citing *Johnson v. State*, 68 S.W.3d 644, 649 (Tex.

pretext based upon an alleged mis-characterization of William's response is insufficient to rebut the prosecutor's race-neutral explanations.

The appellant also claims that four non-African American jury members, as well as five other non-African American venire members who were either struck or successfully challenged by the appellant, received disparate treatment from Williams during the State's voir dire examinations. The State, however, did not engage in disparate treatment with regard to questioning venire members because none of these other prospective jurors put their honesty in question. In contrast, Williams put her veracity at issue when she failed to disclose her daughter's larceny conviction in her jury questionnaire. When asked in Question 71 if she knew of any "close friend or relative that has been charged, arrested, indicted or convicted of any criminal offense above the level of a traffic violation," Williams checked the box marked "No." In response to the State's voir dire question about her daughter's "difficulties in North Carolina," Williams indicated to the prosecutor that she became aware of her daughter's larceny conviction "two or three years ago." In comparison, none of the four non-African-American venire persons who eventually served on the jury, nor the five venire persons excluded by the defense, failed to disclose the criminal history of themselves, close relatives, or friends. Nevertheless, this court will not impute disparate treatment in every instance where one of the State's reasons for striking a juror might technically apply

Crim. App. 2002); *Ford v. State*, 1 S.W.3d 691, 693-94 (Tex. Crim. App. 1999)).

to another venire member whom the State found acceptable.[40]  The concealment of her

daughter's larceny conviction, along with Williams' affiliation to a group that ministers to

prisoners, provided reasonable grounds for concern to the State to warrant its exercise of a

non-race based peremptory strike.

Paulette Bell, juror number 57, was the third African-American venire member

peremptorily struck by the State.  In response to the appellant's *Batson* challenge, the State

testified to the following reasons for its peremptory strike of Bell:

> [State]:      The State struck this juror for a multitude of reasons.  Once,
> she—her husband and son, both [b]lack men, feel like they
> were—pulled over and apparently more than one time [in] her
> son's case, and felt like they were victims of racial profiling.
> Second reason, she was on a criminal jury and found the
> defendant—has been on a criminal [jury] that reached a not
> guilty verdict. [Third] she also spoke that she'd like the chance
> to go to the jail, and minister and preach. [Fourth] she, uh, while
> she indicated today that she would be able to be—consider the
> death penalty, she strongly opposed it in her questionnaire, and
> repeats more than once, under no circumstances could she
> participate in that.
>
> [Defense]:    And Judge, for the record, she's a black female.  Judge, their
> primary reason offered is not a race-neutral reason.  He stated
> specifically that her husband and son are black males, and that
> consequently they choose to strike her from this case because
> they supposedly had been the subject of racial profiling.  That is
> not a race-neutral reason.
>
> [COURT]:      Yeah, but the other ones are.
>
> [Defense]:    Well, they listed as their primary reason—

---

[40]

*See Adanandus v. State*, 866 S.W.2d 210, 224-25 (Tex. Crim. App. 1993).

[State]:       I did not.

[COURT]:   They listed it as the first reason.

[Defense]:   Okay. I'd ask that she be impaneled on that basis, because they
              have not provided race-neutral reasons for striking this juror.

[COURT]:   Okay, that's denied. I mean, it's denied.

The appellant argues that the State's first reason for striking Bell was not race-neutral

and, in the alternative, the State's explanation for its challenge falls within the "mixed

motives" doctrine and the case should, therefore, be remanded.[41] In *Guzman*, the State

offered reasons for its peremptory strike that were both gender based and gender neutral.

However, in ruling on the *Batson* challenge, the trial court failed to make explicit findings

that the State's strike could be based upon the neutral reasons alone, and therefore, the case

was remanded to the trial court to make findings on that issue.

Here, the appellant contends that the prosecutor's pointing out that Bell's husband and

son were "black men" and subjects of "racial profiling" is an indication the State had a

racially discriminatory motive for striking Bell. However, the prosecutor's statement that the

juror's family members were black was made to explain its decision to strike Bell based on

her close familial relationship to persons who believed they experienced racial profiling. The

State's striking of a juror based on her personal or close relative's experiences with or

perceptions of law enforcement, particularly one as negative as racial profiling, is not by

---

41

    *See Guzman v. State*, 85 S.W.3d 242 (Tex. Crim. App. 2002).

itself determinative of racial discrimination.[42]   Thus, the appellant did not rebut the State's

race-neutral reason for striking Bell based on the prosecutor's mere mentioning of the race

of the juror's family members, or its stated concern regarding her family members' previous

experiences with racial profiling.

Even assuming *arguendo* that the State displayed a discriminatory motive in its first

basis for striking Bell and the "mixed motives" doctrine applies, such grounds do not raise

equal protection concerns to a level that would require remanding this case to the trial court

as was done in *Guzman,* and as is now requested by the appellant.[43]   Unlike in *Guzman,* the

State and the trial judge here both noted that the first reason proffered by the State was *not*

the primary reason, but rather the *first* of four reasons the State sought to exclude Bell.   In

addition, the trial judge demonstrated his consideration of the State's other three reasons by

responding to the appellant's contention that the State's first reason was not race-neutral by

saying "Yeah, but the other ones are."   Lastly, the facts in this case contrast with *Guzman*

because the trial judge explicitly denied the appellant's charge of purposeful racial

---

[42]

    *See Williams v. State*, 804 S.W.2d 95, 98 (Tex. Crim. App. 1991) (stating the prosecutor's strategy of selecting jurors not prone to have a prejudice against either the police officers or the State was race-neutral); *see also Hawkins v. State*, 793 S.W.2d 291, 293-94 (Tex. App.–Dallas 1990, pet. ref'd) (holding that a prosecutor's statement that a juror had a prior unpleasant experience with law-enforcement personnel is a race-neutral explanation).

[43]

    *See Guzman*, 85 S.W.3d at 255.

discrimination by the prosecutor.[44]  After reviewing the evidence in a light most favorable to the trial court's ruling, we are able to discern from the present record what the trial court determined concerning the State's allegedly race-based peremptory strike of prospective juror Bell.  Therefore, the trial court did not err in overruling the appellant's *Batson* challenges and a remand is not necessary.  Point of error three is overruled.

In points of error four, five, and six, the appellant alleges that the trial court erred in denying his motion to suppress any statements made or evidence seized following his arrest because he was arrested without a warrant in violation of Article 38.23 and Chapter 14 of the Texas Code of Criminal Procedure, the Fourth and Fourteenth Amendments to the United States Constitution, and Article I § 9, of the Texas Constitution.

At trial, the appellant raised these claims in a general "Motion to Suppress."  The motion merely states that he was arrested without "a valid warrant or probable cause or reasonable suspicion."  He further claims that any and all statements made after the arrest are "fruit of the poisonous tree."  No further argument or citations were made in the motion, at the pre-trial hearing, or at trial.

At the hearing on the motion to suppress, the only evidence presented regarding the appellant's arrest came during the cross-examination of the State's witness, Officer Richard Hodge.  The defense asked the officer how he came in contact with the appellant.  Hodge answered that they were looking for a vehicle that was used in the robbery-murder, that the

---

[44]

*Compare Guzman*, 85 S.W.3d at 254-55.

car was found parked at a house, the occupants of the house were ordered out, the appellant was uncooperative, and he was arrested. Hodge advised the appellant of his rights and explained to him why he was being arrested. The remainder of the questioning revolved around whether the appellant was intoxicated and how certain items of clothing and other evidence were obtained. No other evidence was presented, and no argument was made regarding an arrest, illegal or otherwise. Rather, the hearing focused on the alleged warrantless seizure of specific items of evidence. At the end of the presentation of witnesses, the State specifically requested a ruling on "the admissibility of the clothes taken from the Defendant." The defense agreed. The judge stated: "Yeah. As far as the boxers, the socks and the rape kit, stuff that's in the rape kit, it's all admissible – well, I don't know if it's admissible – well, your Motion to Suppress is denied, let's put it that way." The defense then requested that the trial court reserve its ruling on the Motion to Suppress with regard to the buccal swabs, a pair of shorts, and a t-shirt as the predicate had not been established yet. No express ruling was ever made regarding the warrantless arrest claim nor did the appellant request a ruling at any time.

When a defendant seeks to suppress evidence on the basis of an illegal arrest, the initial burden of proof is placed on the defendant to rebut the presumption of proper conduct.[45] The defendant may satisfy this burden by establishing that he was arrested without

---

[45]

*McGee v. State*, 105 S.W.3d 609, 613 (Tex. Crim. App. 2003); *Russell v. State*, 717 S.W.2d 7, 9 (Tex. Crim. App. 1986).

a warrant.[46]  Once this is shown, the burden shifts to the State to either produce evidence of a warrant or prove the reasonableness of the arrest.[47]

Here, the appellant failed to offer evidence that the arrest was warrantless.  He could have done so easily by asking Officer Hodge if the arrest was made pursuant to a warrant.  The appellant, however, failed to do so.  Therefore, we must presume proper conduct, and the burden never shifted to the State to produce evidence of a warrant or, alternatively, to prove the reasonableness of the arrest.  Assuming *arguendo* that the trial court ruled upon the appellant's warrantless-arrest claim, we presume he did so based upon the foregoing law.  The trial court did not err.  Points of error four, five and six are overruled.

In the appellant's seventh point of error, he posits that the trial court erred in denying his Motion to Suppress because his slippers and socks were illegally seized from him without a warrant, in violation of the Fourth and Fourteenth Amendments to the United States Constitution.  As stated in the previous three points of error, the appellant made only a general statement in his written motion that "the seizure of items, papers and effects from him was effected without valid warrant or probable cause or reasonable suspicion" in violation of the state and federal laws.  The appellant did not set out what specific evidence he wanted suppressed or brief his argument at trial in any way.

---

[46] *Id.*

[47] *Id.*

At the suppression hearing, evidence was elicited that the appellant's socks and slippers were seized from him after his arrest. The appellant was taken to Methodist Specialty Hospital to have a rape kit completed for the sexual assault that preceded the instant offense. Officer Hodge testified that he took the appellant's slippers after the appellant removed them for the exam by the Sexual Assault Nurse Examiner (SANE). The socks were secured by the SANE nurse who then gave them to Officer Hodge. Evidence was further elicited as to how the evidence was secured, tagged, and preserved for testing. Neither the State nor the defense, prior to the trial court expressly denying the Motion to Suppress, made any argument with regard to the items collected at the time of the sexual-assault exam.[48]

Again, the appellant had the burden to show that the items in question were seized without a warrant.[49] And, again, the appellant failed to establish that there was no warrant. However, unlike the claim regarding the alleged warrantless arrest, evidence was elicited regarding the seizure of the items. Assuming *arguendo* that the appellant preserved his

---

[48]

Both the appellant and the State submit that the trial court did not expressly rule upon this evidence. After a careful review of the record, we disagree. The trial court ruled specifically on the rape kit, boxers, socks, and slippers. The judge then stated, "The buccal swab, that kind of goes with everything else. I guess, if its –" The State then interrupted and stated that the shorts, swab, and t-shirt were collected at the police station. The defense then requested that the trial court reserve his ruling as to the shorts and t-shirt as they were "not in complete predicate yet." At no time did the trial court withdraw his ruling regarding the socks and slippers.

[49]

*See McGee,* 105 S.W.3d at 613.

argument on appeal, we hold that it is without merit.

If the trial court's ruling regarding a motion to suppress is reasonably supported by the record and is correct under any theory of law applicable to the case, the reviewing court must affirm.[50] Here, while there is no evidence that the appellant consented to the seizure of his socks or slippers, the evidence does show they were taken pursuant to a lawful custodial arrest.[51] The warrantless seizure of a suspect's clothing subsequent to a legal arrest, while he is in custody or detention, is permissible.[52] "Indeed, it is difficult to perceive what is unreasonable about the police examining and holding as evidence those personal effects of the accused that they already have in their lawful custody as the result of a lawful arrest."[53] Point of error seven is overruled.

In points of error eight and nine, the appellant complains that the trial court erred in admitting into evidence State's Exhibit 10, an autopsy identification photograph of the

---

[50]

*Romero v. State*, 800 S.W.2d 539, 543-44 (Tex. Crim. App. 1990).

[51]

The appellant failed to successfully challenge the legality of his arrest. *See* points of error four five, and six, *supra*. Further, after a thorough review of the record at trial, we hold that there was sufficient probable cause and reasonable suspicion to arrest the appellant without a warrant, assuming there was not one, in accordance with both state and federal laws.

[52]

*See U.S. v. Edwards*, 415 U.S. 800, 805-09 (1974) (defendant's clothing seized the morning after his arrest, when it became apparent clothes might be evidence of crime); *Marquez v. State*, 725 S.W.2d 217, 234 (Tex. Crim. App. 1987).

[53]

*Edwards*, 415 U.S. at 806 (citations omitted).

victim, at the guilt phase of trial. Specifically, he alleges that the prejudicial nature of the photograph substantially outweighed its probative value and that it was needlessly cumulative.[54]

When determining whether the trial court erred in admitting relevant photographs into evidence, our review is limited to determining whether the probative value of the photos is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay or needless presentation of cumulative evidence.[55] The trial court's decision is reviewed under an abuse of discretion standard, and may be disturbed on appeal only when the trial court's decision falls outside the zone of reasonable disagreement.[56]

A court may consider many factors in determining whether the probative value of photographs is substantially outweighed by the danger of unfair prejudice. These factors include: the number of exhibits offered, their gruesomeness, their detail, their size, whether they are in color or black and white, whether they are close-up, and whether the body depicted is clothed or naked.[57] A court, however, should not be limited by this list. The

---

[54] TEX. R. EVID. 403.

[55] TEX. R. EVID. 403; *Long v. State*, 823 S.W.2d 259, 271 (Tex. Crim. App. 1991), citing *Montgomery v. State*, 810 S.W.2d 372, 389 (Tex. Crim. App. 1991) (op. on reh'g).

[56] *Montgomery*, 810 S.W.2d at 391.

[57] *Long*, 823 S.W.2d at 272.

availability of other means of proof and the circumstances unique to each individual case should also be considered.[58]  In reviewing the complained-of photograph, we note initially that it is in color and is 8 ½" x 11" in size.

Our review shows that State's Exhibit 10 is an autopsy identification photo of the victim.  The victim is shown unclothed from the chest up, lying on a table.  The medical examiner's placard showing the case number is placed across the victim's chest.  The placard covers up most of the chest and most of the entry gunshot wound.  The photo was used twice by the State during the guilt phase.  The State's first witness, Mitesh Patel, the victim's son, was shown the photo to identify that his father was the victim in this case.  The defense did not object when the photo was displayed for identification purposes.  The photo was not admitted into evidence at that time.  The next time the photo was displayed was during the medical examiner's testimony.  The medical examiner, Dr. Jennifer Rulon, early in her testimony, testified that each autopsy exam is assigned a specific case number that goes on her autopsy report and any other reports.  At the end of her direct testimony, Dr. Rulon explained how she always takes an identification photo of the deceased with a placard that has the case number on it.  The State then asked if Exhibit 10 shows that "this is the individual who you've been discussing having done the autopsy on?"  Dr. Rulon replied, "Yes."  The photo was admitted over the appellant's objection.

---

[58] *Id.*

The admissibility of a photograph is within the sound discretion of the trial judge.[59] A photograph is generally admissible if verbal testimony about the matters depicted in the photograph is also admissible.[60] State's Exhibit 10 is an autopsy identification photo. It depicts the victim before autopsy and displays the autopsy number assigned to that victim. A photo of the victim displaying the autopsy number ensures that the autopsy report will correspond to the photo of the correct victim. Thus, even though the victim's identification was initially based on his son's testimony, the medical examiner's office still utilized the photo for the purpose of tying the victim to his assigned case number. For this reason, the autopsy identification photo was relevant and not cumulative of the autopsy photographs exhibiting the wounds. Regarding the appellant's claim under Texas Rule of Evidence 403, we cannot say that the trial court abused its discretion in holding that the probative value of the photograph outweighed the danger of unfair prejudice. The complained-of picture is not particularly gruesome or detailed, it is not enhanced in any way, and it portrays no more than the condition of the victim due to the injuries inflicted. Therefore, we overrule points of error eight and nine.

In point of error ten, the appellant complains that the trial court erred when it denied his request for a jury charge on the lesser-included offense of murder. Specifically, he argues

---

[59] *Paredes v. State*, 129 S.W.3d 530, 539-40 (Tex. Crim. App. 2004); *Williams v. State*, 958 S.W.2d 186, 195 (Tex. Crim. App. 1997).

[60] *Id*. at 540.

that, because a police officer testified that he thought the audio on the store's surveillance video was "unintelligible," there is no evidence that he committed murder in the course of robbing or attempting to rob Patel. Alternatively, he argues that, because at the beginning of the surveillance video the appellant asks how much dry cleaning costs, there is evidence that he did not intend to rob Patel.

In determining whether the appellant is entitled to a charge on a lesser-included offense, we must consider all of the evidence introduced at trial, whether produced by the State or the defendant.[61] This Court uses a two-pronged test in its review.[62] First, the lesser-included offense must be included within the proof necessary to establish the offense charged; second, there must be some evidence in the record that if the defendant is guilty, he is guilty only of the lesser-included offense.[63] The credibility of the evidence and whether it conflicts with other evidence or is controverted may not be considered in determining

---

[61]

*Goodwin v. State*, 799 S.W.2d 719, 740 (Tex. Crim. App. 1990).

[62]

*Rousseau v. State*, 855 S.W.2d 666, 672-75 (Tex. Crim. App. 1993); *Goodwin*, 799 S.W.2d at 740-41.

[63]

*See Hall v. State*, 225 S.W.3d 524, 536 (Tex. Crim. App. 2007), *quoting Bignall v. State*, 887 S.W.2d 21, 23 (Tex. Crim. App. 1994) ("A defendant is entitled to an instruction on a lesser-included offense where the proof for the offense charged includes the proof necessary to establish the lesser-included offense and there is some evidence in the record that would permit a jury rationally to find that if the defendant is guilty, he is guilty only of the lesser-included offense.").

whether an instruction on a lesser-included offense should be given.[64]

This Court has long held that murder is a lesser-included offense of capital murder.[65] Therefore, the appellant has met the first prong of the test. However, the appellant fails to meet the second prong. First, we point out that the appellant contradicts himself in his argument. He states that the surveillance audio is completely unintelligible, but then admits that he can discern what is being said at the beginning of the tape. We note that this Court has listened to the tape and is able to discern the statements made by the appellant. However, even assuming the police officer was correct and the audio was unintelligible, there is no evidence that the appellant is guilty of only the lesser-included offense of murder. In viewing the surveillance video with no sound, we observe that the video shows the appellant entering the store, drawing a weapon, forcing Patel to the register at gunpoint, shooting Patel, going to the register, and then leaving the store.

Given these facts, we conclude that there is no evidence in the record from which a rational trier of fact could determine that the appellant was guilty only of murder. The trial judge did not err in refusing the instruction. Point of error ten is overruled.

In his twelfth and thirteenth points of error, the appellant claims that the trial court erred when it overruled his objection and permitted the admission of evidence at punishment

---

[64] *Banda*, 890 S.W.2d at 60.

[65] *See Feldman v. State*, 71 S.W.3d 738, 750 (Tex. Crim. App. 2002); *Thomas v. State*, 701 S.W.2d 653, 656 (Tex. Crim. App. 1985).

regarding an extraneous shooting incident. Specifically, the appellant complains that the evidence was not relevant to the punishment issues and that the probative value of the evidence was substantially outweighed by its prejudicial effect. He argues that the evidence was not relevant because the State did not "clearly prove" that he committed the extraneous offense.

Generally, evidence of extraneous acts involving a defendant is relevant and admissible in the punishment stage of a capital case.[66] Further, Rule 403 favors the admission of relevant evidence and carries a presumption that relevant evidence will be more probative than prejudicial.[67] However, before a trial court may admit evidence of uncharged misconduct (also known as "extraneous offenses" or "extraneous misconduct"), the State must "clearly prove" that the misconduct occurred and that the defendant was the perpetrator.[68] It is enough that the State presents evidence that, if believed, establishes that the defendant himself committed the extraneous misconduct.[69]

The evidence here showed that on May 9, 2004, the appellant was living with Chala

---

[66]

   *See McFarland v. State*, 928 S.W.2d 482, 512 (Tex. Crim. App. 2006); *Patrick v. State*, 906 S.W.2d 481, 494 (Tex. Crim. App. 1995).

[67]

   *Williams v. State*, 958 S.W.2d 186, 196 (Tex. Crim. App. 1997); *Montgomery*, 810 S.W.2d at 389.

[68]

   *Chamberlain v. State*, 998 S.W.2d 230, 235 (Tex. Crim. App.1999).

[69]

   *Harris*, 827 S.W.2d at 961.

Riley. Riley testified that she was sitting with the appellant on the front porch of their home when an individual known as "C-Small" drove by. The appellant got "all hyped up." She heard the appellant say "I'm going to go get C-Smalls. I'm going to shoot C-Small." The appellant then left the house with his older brother, who had been inside. Shortly thereafter, Riley heard five or more gunshots not far from the house. She testified that the appellant later told her that "he had shot at C-Smalls."

Officer Joseph Briseno testified that he was called to the scene of a shooting at an apartment complex that was next to the appellant's house. When he arrived, he noticed two suspects fleeing the location. The appellant was one of the suspects. As Briseno approached the appellant, the appellant reached into his waistband and threw a gun into the bushes. Briseno recovered the weapon which was fully loaded. Briseno testified that the appellant told him that he got the gun in self-defense and that he and "C-Small" were shooting at each other. Shell casings were recovered from the parking lot and were found to have come from the appellant's gun. The appellant also had gunshot residue on his hands.

We hold that the appellant's out-of-court admissions that he committed the act of misconduct, along with his possession of the weapon and forensic evidence, constituted "clear proof" that he committed the extraneous offense. We conclude that the trial court did not err in holding that the probative value of the evidence was not substantially outweighed by the danger of unfair prejudice under Rule of Evidence 403.

We note that all evidence connecting a defendant with a particular crime is highly

prejudicial. However, here the evidence of the extraneous shooting was clearly probative of whether the appellant would be a future danger. It is only when there exists a clear disparity between the degree of prejudice of the offered evidence and its probative value that Rule 403 bars its admission.[70] In reviewing the record before us, we cannot say that the probative value of the extraneous shooting was substantially outweighed by the danger of unfair prejudice. Points of error twelve and thirteen are overruled.

In point of error fourteen, the appellant alleges that the trial court erred when it denied his motion for mistrial at punishment. He argues that Officer Briseno's spontaneous statement that the weapon used by the appellant in the May 2004 shooting was a "stolen firearm" caused him incurable prejudice. With respect to this point of error, the record reflects that Officer Briseno testified that he witnessed the appellant throw a gun into the bushes; the officer further testified that he was the one who recovered the weapon. On re-direct examination, the following occurred:

[State]: Officer, what type of gun was it?

[Briseno]: It's a semi-automatic handgun. It was a Republic Arms, Patriot .45 caliber, silver and black .45 caliber; one in the chamber and six in the clip. And it was also a stolen firearm.

[Defense]: Judge, I'm going to object.

[COURT]: Sustained. Ladies and Gentlemen of the jury, step outside.

---

[70]

*Jones v. State*, 944 S.W.2d 642, 652 (Tex. Crim. App. 1996); *Joiner v. State*, 825 S.W.2d 701, 708 (Tex. Crim. App. 1992).

The court then reprimanded the officer for providing the additional information that the gun was stolen. Defense counsel requested an instruction to disregard and moved for a mistrial. The motion for mistrial was denied, but the court did instruct the jury upon their return to "disregard the last question and answer by this witness in every form and fashion."

A witness's inadvertent reference to an extraneous offense is generally cured by a prompt instruction to disregard.[71] A mistrial is a device used to halt trial proceedings when error is so prejudicial that expenditure of further time and expense would be wasteful and futile.[72] Therefore, a mistrial should be granted only in cases where the "reference was clearly calculated to inflame the minds of the jury or was of such damning character as to suggest it would be impossible to remove the harmful impression from the jurors' minds."[73]

We discern no abuse of discretion in the trial court's denial of a mistrial. The testimony in issue did not actually assert that the appellant stole the weapon or that he knew it was stolen. The trial court could have reasonably concluded that the answer was not so inflammatory as to be incurable by an instruction to disregard. Point of error fourteen is overruled.

Finally, in the appellant's fifteenth point of error, he complains that the trial court,

---

[71] *Rojas v. State,* 986 S.W.2d 241, 251 (Tex. Crim. App. 1998); *Kipp v. State*, 876 S.W.2d 330, 339 (Tex. Crim. App. 1994).

[72] *Ladd v. State*, 3 S.W.3d 547, 567 (Tex. Crim. App. 1999).

[73] *Rojas*, 986 S.W.2d at 250.

when instructing the jury regarding the mitigation special issue, failed to give the instruction contained in Article 37.071, § 2(f)(3). He argues that this violated his rights under both the Eighth and Fourteenth Amendments to the United States Constitution.

At punishment, the trial court instructed the jury:

The second issue is:

State whether, taking into consideration all the evidence, including the circumstances of the offense, the defendant's character and background, and the personal moral culpability of the defendant, there is a sufficient mitigating circumstance or are sufficient mitigating circumstances to warrant that a sentence of life imprisonment rather than a death sentence be imposed.

Jurors were not instructed that they "need not agree on what particular evidence supports an affirmative finding on the issue."[74]

The appellant argues that the charge robbed him of the safeguard of having jurors made unambiguously aware that they did not need to agree on the particular evidence that supported a "yes" answer to the mitigation issue. The appellant further argues that the instruction skewed the jury's understanding in the prosecution's favor, and therefore, he was denied the constitutional guarantee of jury unanimity.

The appellant did not object to the charge, but now contends that the lack of the instruction egregiously harmed him under the standard set out in *Almanza v. State*.[75] The

---

[74] Art. 37.071, § 2(f)(3).

[75] 686 S.W.2d 157, 171 (Tex. Crim. App. 1984) (op. on reh'g).

appellant relies on *Mills v. Maryland*[76] to support his argument that the lack of the Article 37.071, § 2(f)(3), instruction requires reversal. The charge in *Mills* listed the statutorily available mitigating circumstances in that case and directed jurors to unanimously affirm whether they agreed or disagreed that each circumstance did or did not exist.[77] The United States Supreme Court found that such a charge improperly required that all jurors unanimously agree on the mitigating circumstances before finding that those circumstances warranted a life sentence.[78] However, even when presented with the circumstances in *Mills*, the Supreme Court did not go so far as to say it is a constitutional requirement that every jury deliberating punishment in a capital case should be explicitly instructed that the jurors need not agree on the particular mitigating circumstances.

In this case, while jurors were not given the statutorily required instruction that they need not agree on the particular mitigating evidence, they unanimously found that no sufficient mitigating circumstance or circumstances warranted that a life sentence be imposed. The foreman signed the answer that stated: "We, the jury, unanimously find and determine that the answer to this Special Issue is 'No.'" Because no juror believed there was a circumstance or circumstances that warranted a life sentence, there was no possibility that

---

[76] 486 U.S. 367 (1988).

[77] *Id*. at 378.

[78] *Id*. at 384.

the jurors would be confused about a need to agree on a particular circumstance or circumstances.

Although the trial court erred in failing to give the statutory instruction, in this case, the appellant was not deprived of the constitutional guarantee of a unanimous verdict and did not suffer egregious harm. Nor was the appellant denied a fair trial. Point of error fifteen is overruled.

We affirm the judgment of the trial court.

DELIVERED:      April 22, 2009
PUBLISH